[No. 65553-7. En Banc.]
Argued March 24, 1998.     Decided July 30, 1998.

MARLENE WINCHESTER, *as Personal Representative, Plaintiff*, v. JOHN KENNETH STEIN, ET AL., *Defendants*.

THE STATE OF WASHINGTON *on the relation of Arthur D. Curtis, Respondent*, v. JOHN KENNETH STEIN, ET AL., *Petitioners*.

ALEXANDER, JOHNSON, MADSEN, and SANDERS, JJ., dissent by separate opinion.

*Kenneth J. Selander* and *Nancy L. Talner* (*Bethany Norb-erg*, of counsel), for petitioners.

*Arthur D. Curtis, Prosecuting Attorney for Clark County*, and *Dennis M. Hunter, Deputy*, for respondent.

*Christine O. Gregoire, Attorney General of the State of Washington*, and *Frederick J. Caruso, Assistant*, on behalf of the Office of the Attorney General, amicus curiae.

Guy, J. — In this case, we are asked whether an action brought under our state's Criminal Profiteering Act for monetary damages to victims of crime and other penalties violated the double jeopardy rights of those parties who had been previously tried in criminal proceedings.

## FACTS

There is a large record in this case, but only a brief description of the facts is necessary to understand the legal issue before us. Ned Hall, a probate attorney in Vancouver, served as Nick Stein's attorney for a number of years in matters involving Nick's property. Nick's son, Jack Stein,

opposed Mr. Hall's legal position on a number of matters involving his father's property. Nick Stein, with Mr. Hall's assistance, was successful in having a bank appointed as the trustee for Nick Stein's significant estate. The trustee bank and Ned Hall, on behalf of Nick Stein, brought an action to have a transfer of a real estate contract from Nick Stein to Jack Stein set aside on the basis of fraud and undue influence. Thelma Lund, a longtime friend of Nick Stein, testified on behalf of the limited guardian and adversely to Jack Stein. The trial judge, Tom Lodge, set aside the transfer on the basis of undue influence and ruled against Jack Stein in several other lawsuits regarding his father's property.

Testimony indicates that Jack Stein asked his stepson, Michael Norberg, to hire "hitmen" to kill Ned Hall, Thelma Lund, Judge Lodge, and others. Norberg hired Richard Bailey and Gordon Smith. In April 1987, Thelma Lund was severely beaten and strangled to death in her home. In June 1987, several attempts were made to murder Ned Hall.

Jack Stein was convicted of three counts of attempted murder in the first degree and one count of burglary in the first degree with regard to the attempts on Hall's life and was found not guilty of the murder of Lund. Norberg pleaded guilty to conspiracy to commit murder in the second degree. Smith pleaded guilty to conspiracy to murder and to attempting to murder Hall. Bailey pleaded guilty as an accomplice to the murder of Thelma Lund and the attempted murder of Ned Hall.

The estate of Thelma Lund filed a wrongful death action against Jack Stein and Michael Norberg and the State filed a criminal profiteering action against Jack Stein, Michael Norberg, Richard Bailey and Gordon Smith. The trial court consolidated the two actions and the case was tried to a jury.

Michael Norberg's statement on plea of guilty was admitted into evidence. He stated that Jack Stein had asked him to find "hitmen" to kill certain people and that between

1983 and 1986, Jack Stein told him that several people, including Ned Hall, Judge Lodge, and Thelma Lund were causing problems for him. Jack Stein told Norberg that he would provide money if Norberg could locate people who would eliminate those people causing Jack his problems. The money to be paid was $10,000 for each person on the "list." He stated that Jack Stein had told him that Ned Hall was getting in the way of Jack's plans to handle Nick Stein's money and property. Norberg stated that Bailey and Jack Stein had also discussed blowing up the Clark County courthouse with a bomb in order to kill Judge Lodge. Jack Stein's psychologist testified that Jack Stein had told him he wanted to obtain hitmen to kill Judge Lodge and Ned Hall. Another witness testified that Michael Norberg and Jack Stein offered him $10,000 to kill Thelma Lund and $10,000 to kill the attorney who represented Nick Stein.

The jury found in favor of Thelma Lund's estate in the wrongful death action and in favor of the State in the criminal profiteering action. The jury concluded by special verdict that: (1) Stein, Norberg and Bailey had conspired to commit murder between 1984 and 1987; (2) Stein, Norberg and Bailey had attempted to commit murder in the first or second degree or extortion in the first degree on April 13, 1987; (3) Stein, Norberg and Bailey had caused the death of Thelma Lund on April 13, 1987; (4) the total damages for injury to the person, the estate or heirs of Thelma Lund was $4,000,000; (5) Stein, Norberg, Bailey and Smith had attempted to commit murder in the first degree on June 1, 1987; (6) Stein, Norberg, Bailey and Smith had attempted to commit murder in the first degree between June 1 and 14, 1987; (7) Stein, Norberg, Bailey and Smith had attempted to commit murder in the first degree on June 14, 1997; (8) Stein, Norberg, Bailey and Smith had engaged in the act of criminal profiteering as defined in the court's instructions; (9) Stein, Norberg, Bailey and Smith had engaged in a pattern of criminal profiteering activity as defined in the court's instructions; (10) the total amount of damages for injury to the person or property of Ned Hall

was $8,200; (11) the costs and expenses incurred in the investigation and prosecution had been $223,894.19.

Pursuant to RCW 9A.82.100(4)(d), the trial court trebled the damages due the victims, adding $8,000,000 to be held in trust for the benefit of Lund's estate. The trial court also awarded the following amounts to the State: $24,600 to be held in trust for Ned Hall as treble damages; $223,894.19 for the cost of investigation and prosecution; $250,000 as a civil penalty under the Criminal Profiteering Act payable to the Clark County Anti-Criminal Profiteering Revolving Fund; and $38,301 for costs, disbursements, and attorney fees incurred by the State. Stein and Norberg appealed and the Court of Appeals affirmed all aspects of the judgment except the $250,000 penalty. *Winchester v. Stein*, 86 Wn. App. 458, 937 P.2d 618, *review granted in part*, 133 Wn.2d 1010 (1997).

In the Court of Appeals, Stein and Norberg raised the following issues: whether the State's action under the Criminal Profiteering Act violated double jeopardy, whether the judgments were excessive, whether the court erred in denying Stein's request for a separate trial from Norberg and in consolidating the profiteering and the wrongful death actions, and whether the court erred in admitting a letter from Stein's psychologist which had reported that Stein had told him he wanted to hire a "hitman" to kill his father's lawyer, Ned Hall, and a judge who had ruled against him. The Court of Appeals, relying on *United States v. Halper*, 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989), concluded that neither the treble damages to the murdered woman's estate nor the award to the State for the costs of the criminal or civil litigation was punishment for purposes of the double jeopardy doctrine, but that the $250,000 civil penalty was solely punishment and therefore barred by double jeopardy. *Winchester*, 86 Wn. App. at 464. The Court of Appeals affirmed the trial court on all other issues, concluding that the damages to the murdered woman's estate were not excessive, that the trial court properly denied the motion to sever the trials and properly

consolidated the actions, and that the testimony of the psychologist was properly admitted.

Jack Stein sought review of the Court of Appeals decision and the State sought review of that part of the Court of Appeals decision that reversed the civil penalty. We accepted review. The attorney representing the estate of Thelma Lund filed a motion seeking clarification of the issues before this Court. We granted the motion to clarify the issues and entered an order stating:

> Review is limited to the issues of whether the exemplary damages and civil penalty awarded in the State's criminal profiteering action violate double jeopardy principles. The parties are further directed to submit supplemental memoranda discussing the effect on this case of the United States Supreme Court's decision in *Hudson v. United States*, [522 U.S. 93, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997)].

As a result of this order, the estate of Thelma Lund is no longer appearing in this appeal and the only issue on review is double jeopardy.

## ISSUE

Does an action brought under the Washington Criminal Profiteering Act, RCW 9A.82, for treble damages to the victims of crime and for other sanctions following a criminal proceeding violate the double jeopardy clause?

## DISCUSSION

■ Whether an action for civil sanctions following a criminal conviction violates double jeopardy is an issue of law which is reviewed de novo. *E.g.*, *LaCrosse v. Commodity Futures Trading Comm'n*, 137 F.3d 925 (7th Cir. 1998); *United States v. $292,888.04 in U.S. Currency*, 54 F.3d 564, 566 (9th Cir. 1995).

Article I, section 9 of the Washington Constitution states: "No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for

the same offense." The double jeopardy clause of the federal constitution provides that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

The Supreme Court has declared that " 'Congress may impose both a criminal and a civil sanction in respect to the same act or omission.' " *United States v. Ursery*, 518 U.S. 267, 292, 116 S. Ct. 2135, 135 L. Ed. 2d 549 (1996) (quoting *Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S. Ct. 630, 82 L. Ed. 917 (1938)); *United States v. Ward*, 448 U.S. 242, 250, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980); *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 235, 93 S. Ct. 489, 34 L. Ed. 2d 438 (1972). We have explained that double jeopardy does not apply " 'unless the sanction sought to be imposed in the second proceeding is punitive in nature so that the proceeding is essentially criminal.' " *In re Personal Restraint of Young*, 122 Wn.2d 1, 24, 857 P.2d 989 (1993) (quoting *O'Day v. King County*, 109 Wn.2d 796, 817, 749 P.2d 142 (1988)). In the United States Supreme Court opinion which we asked the parties to brief, the Court stated:

> We have long recognized that the Double Jeopardy Clause does not prohibit the imposition of any additional sanction that could, " ' in common parlance,' " be described as punishment. The Clause protects only against the imposition of multiple *criminal* punishments for the same offense.

*Hudson v. United States*, 522 U.S. 93, 98-99, 118 S. Ct. 488, 493, 139 L. Ed. 2d 450 (1997) (citations omitted).

It is settled law that an acquittal on a criminal charge is not a bar to a civil action by the government, remedial in its nature, arising out of the same facts on which the criminal proceeding was based. *Cole v. United States Dep't of Agric.*, 133 F.3d 803, 805 (11th Cir. 1998) (citing *Helvering*, 303 U.S. at 397); *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 359, 104 S. Ct. 1099, 79 L. Ed. 2d 361 (1984). The Supreme Court has also held that it is not a bar to a private civil treble damages Racketeer Influenced and Corrupt Organizations Act (RICO) action that the

defendants have not been convicted of the underlying predicate crimes. *Sedima v. Imrex Co.*, 473 U.S. 479, 493, 105 S. Ct. 3292, 87 L. Ed. 2d 346 (1985).

We held in *State v. Gocken*, 127 Wn.2d 95, 896 P.2d 1267 (1995), that the double jeopardy clause in CONSTITUTION article I, section 9 is given the same interpretation the Supreme Court gives to the double jeopardy clause in the Fifth Amendment. *See also State v. Cole*, 128 Wn.2d 262, 274 n.7, 906 P.2d 925 (1995); *State v. Hardesty*, 129 Wn.2d 303, 309 n.2, 915 P.2d 1080 (1996). In *State v. Catlett*, 133 Wn.2d 355, 359, 945 P.2d 700 (1997), we accepted review in a double jeopardy case and asked the parties to brief the question whether, in light of *Ursery*, 518 U.S. 267, CONSTITUTION article I, section 9 should be interpreted as more protective than the double jeopardy clause of the Fifth Amendment.

In *Catlett*,[1] we adopted the two-part test of *One Assortment of 89 Firearms*, 465 U.S. 354, and *In re Young*, 122 Wn.2d 1, for the purpose of determining whether a statute is remedial or punitive under article I, section 9 of our state constitution. We articulated the test as follows:

> The categorization of a particular statute as civil or criminal is largely a matter of statutory construction. The Supreme Court has adopted a 2-part analysis:
>
> > First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.

*Catlett*, 133 Wn.2d at 365 (citations omitted) (quoting *Ward*, 448 U.S. at 248-49). Following our *Catlett* case, the Supreme Court decided *Hudson*, 522 U.S. 93. The test for double jeopardy set out by the *Hudson* Court is substantially the

---

[1]The petitioners in this case rely on *State v. Clark*, 124 Wn.2d 90, 875 P.2d 613 (1994), which was overruled by this Court in *State v. Catlett*, 133 Wn.2d 355, 945 P.2d 700 (1997).

same methodology described by this Court in *Catlett*. Therefore, under both the federal and the state constitutions, the test for double jeopardy is the one set out in *Hudson* and in *Catlett*.

In *Hudson*, the Office of the Comptroller of the Currency imposed monetary penalties and occupational debarment on the defendants for violating federal banking statutes. The government later criminally indicted the defendants for the same conduct, and the defendants moved to dismiss on double jeopardy grounds. The Supreme Court held that double jeopardy did not bar the later prosecution since the previous proceeding was civil and not criminal. The Court disavowed the method of analysis used in *Halper*, 490 U.S. 435, and reaffirmed the previously established rule exemplified in *Ward*, 448 U.S. 242. *Hudson*, 522 U.S. at 96. In reaching its conclusion in *Hudson*, the Court acknowledged that all civil penalties have some deterrent effect and that if a sanction must be "solely" remedial to avoid implicating the double jeopardy clause, then no civil penalties are beyond the scope of the clause. *Id.* at 102.

The *Hudson* methodology, which clarified the test for determining whether a particular sanction is criminal or civil for the purposes of double jeopardy analysis, was stated as follows:

> Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. *Helvering*, [303 U.S] at 399. . . . A court must first ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Ward*, 448 U.S., at 248. . . . Even in those cases where the legislature "has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect," *id.*, at 248-49, . . . as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty," *Rex Trailer Co. v. United States*, 350 U.S. 148, 154[, 76 S. Ct. 219, 222, 100 L. Ed. 149] (1956).

> In making this latter determination, the factors listed in

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69[, 83 S. Ct. 554, 567-568, 9 L.Ed.2d 644] (1963), provide useful guideposts, including: (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned." It is important to note, however, that "these factors must be considered in relation to the statute on its face," *id*. at 169, and "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty. *Ward*, [448 U.S.] at 249.

*Hudson*, 522 U.S. at 99-100.

The *Hudson* Court specifically disavowed the part of the *Halper* opinion which focused on whether the sanction, regardless of whether it was civil or criminal, was so grossly disproportionate to the harm caused as to constitute "punishment." The Court found this to be erroneous because it elevated a single *Kennedy* factor, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963), to dispositive status. The Court pointed out that no one factor could be dispositive, as they often point in different directions. The other error in *Halper* was the Court's decision to " 'asses[s] the character of the actual sanctions imposed' " rather than, as *Kennedy* demanded, " 'evaluating the statute on its face' " to determine whether it provided for what amounted to a criminal sanction. *Hudson*, 522 U.S. at 101. The Court explained that this was unworkable, because the determination whether a second proceeding violated double jeopardy would not be made until the sanction was imposed and even the attempt to criminally punish a second time would violate double jeopardy. The focus therefore is on the sanction allowed by the statute, not the actual sanction imposed in a particular case.

Applying the *Hudson* methodology to the facts of this case, we conclude that the action imposing monetary sanctions and treble damages did not constitute a violation of double jeopardy. The first part of the *Hudson* test asks if the Legislature intended the "penalizing mechanism" to be civil or criminal. The penalizing mechanism here is the state Criminal Profiteering Act, RCW 9A.82.

There is very little Washington law generally discussing the Criminal Profiteering Act.[2] This Court has characterized our Criminal Profiteering Act as a "little RICO" statute. *Rice v. Janovich*, 109 Wn.2d 48, 55, 742 P.2d 1230 (1987). Our statute is similar in many ways to the federal RICO act.[3] Because of the similarities, it is helpful to look to federal RICO cases. *See City of Bellevue v. Cashier's Check for $51,000 & $1,130 in U.S. Currency*, 70 Wn. App. 697, 701, 855 P.2d 330 (1993); *Rozner v. City of Bellevue*, 116 Wn.2d 342, 351, 804 P.2d 24 (1991). The Court of Appeals recently noted that law construing the federal RICO act is of assistance in construing our state profiteering act. *State v. Barnes*, 85 Wn. App. 638, 667, 932 P.2d 669, *review denied*, 133 Wn.2d 1021 (1997). Other states have looked to the federal RICO act when construing their state "little RICO" acts. *E.g., State v. Huynh*, 519 N.W.2d 191, 194

---

[2]The Court of Appeals recently concluded that a prosecution under the Criminal Profiteering Act was not barred under double jeopardy principles by a previous dismissal in a civil forfeiture action. *State v. Barnes*, 85 Wn. App. 638, 650, 932 P.2d 669, *review denied*, 133 Wn.2d 1021 (1997). However, the discussion is brief and preceded the Supreme Court's decision in *Hudson v. United States*, 522 U.S. 93, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1977). The Court of Appeals in *State v. Frodert*, 84 Wn. App. 20, 924 P.2d 933 (1996), *review denied*, 131 Wn.2d 1017 (1997), held that a civil judgment under the Criminal Profiteering Act did not violate double jeopardy. However, that case dealt only with the gain that a person had acquired through an offense included in the definition of criminal profiteering and did not address the civil penalties or treble damages available under that statute. That case is narrow on its facts because it dealt only with "proceeds" of illegal activity.

[3]However, our statute is narrower in some respects than the federal act. The federal act requires only two predicate crimes committed over ten years to show a pattern of racketeering activity and our state act requires three crimes in five years to show a pattern of criminal profiteering. RCW 9A.82.010(15); 18 U.S.C. § 1961(5). Our act also requires that the predicate crimes be motivated by economic gain; federal RICO does not require an economic purpose. *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994).

(Minn. 1994); *Boyd v. State,* 578 So. 2d 718, 720 (Fla. Dist. Ct. App. 1991);

The federal RICO act, 18 U.S.C. §§ 1961-1968, was enacted in 1970. Congress enacted RICO to combat organized crime; but, although it had organized crime as its focus, the act was not limited in application to organized crime. *National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 260, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994). The Supreme Court has explained that the federal RICO act is to be read broadly and that it is to be "liberally construed to effectuate its remedial purposes." *Sedima,* 473 U.S. at 497-98. RICO provides for both civil and criminal remedies to redress violations of the act, as does the Washington Criminal Profiteering Act. 18 U.S.C. §§ 1961-1968; RCW 9A.82. The Senate report regarding the federal RICO statute recognized a difference between criminal and civil enforcement in describing proposed civil remedies that would have been available to the government. The report emphasized that although those proposed remedies were intended to place additional pressure on organized crime, they were intended to reach essentially an economic, not a punitive goal. The Senate report explained:

> However remedies may be fashioned, it is necessary to free the channels of commerce from predatory activities, *but* there is no intent to visit punishment on any individual; the purpose is civil. Punishment as such is limited to the criminal remedies . . . .

S. REP. No. 91-617, at 81 (1969), *quoted in Sedima,* 473 U.S. at 529 (Powell, J., dissenting).

In an effort to combat organized crime, a number of states, including Washington, have enacted their own versions of RICO. *See* Michael P. Sullivan, Annotation, *Civil Action for Damages under State Racketeer Influenced and Corrupt Organizations Acts (RICO) for Losses from Racketeering Activity,* 62 A.L.R.4TH 654, 657 (1988). In 1985, the Washington Legislature passed the Criminal Profiteering

Act (formerly Racketeering Act[4]). The act created several new crimes and also provided for a variety of civil penalties and remedies. "Criminal profiteering" includes the commission, or attempted commission, for financial gain, of any one of a number of crimes listed in the statute. Among the crimes which may constitute profiteering are many violent felonies and felonies relating to gambling, drugs, pornography, prostitution, extortion, and securities fraud. The act provides that a "pattern of criminal profiteering activity" means engaging in at least three acts of criminal profiteering within a five-year period. To constitute a "pattern," the three acts must have the same or similar intent, results, accomplices, principals, victims or methods of commission, or be otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise, and must not be isolated events. A "pattern" of profiteering is usually required before any of the special civil remedies apply. RCW 9A.82.010(14), (15); 9A.82.100; FINAL LEGISLATIVE REPORT, 49th Wash. Leg., 1st Reg. Sess. 139-40 (1985).

RCW 9A.82.100 is the remedies and procedures section of the Criminal Profiteering Act and provides in relevant part:

(1)(a) A person who sustains injury to his or her person, business, or property by an act of criminal profiteering that is part of a pattern of criminal profiteering activity or by a violation of RCW 9A.82.060 [involving leading organized crime] or 9A.82.080 [involving using proceeds of a pattern of criminal profiteering for investing in property] may file an action in superior court for the recovery of damages and costs of the suit, including reasonable investigative and attorney's fees.

(b) The attorney general or county prosecuting attorney may file an action: (i) On behalf of those persons injured or, respectively, on behalf of the state or county if the entity has sustained damages, or (ii) to prevent, restrain, or remedy a pattern of criminal profiteering activity or a violation of RCW 9A.82.060 or 9A.82.080.

---

[4]In the 1985 legislative session, the statute was renamed the Criminal Profiteering Act instead of the Racketeering Act. FINAL LEGISLATIVE REPORT, 49th Wash. Leg., 1st Reg. Sess. 140 (1985).

(c) An action for damages filed by or on behalf of an injured person, the state, or the county shall be for the recovery of damages and the costs of the suit, including reasonable investigative and attorney's fees.

(d) In an action filed to prevent, restrain, or remedy a pattern of criminal profiteering activity or a violation of RCW 9A.82.060 or 9A.82.080, the court, upon proof of the violation, may impose a civil penalty not exceeding two hundred fifty thousand dollars, in addition to awarding the cost of the suit, including reasonable investigative and attorney's fees.

. . . .

(4) Following a determination of liability, orders may include, but are not limited to:

. . . .

(d) Ordering the payment of actual damages sustained to those persons injured by a violation of RCW 9A.82.060 or 9A.82.080 or an act of criminal profiteering that is part of a pattern of criminal profiteering, and in the court's discretion, increasing the payment to an amount not exceeding three times the actual damages sustained.

(e) Ordering the payment of all costs and expenses of the prosecution and investigation of a pattern of criminal profiteering activity or a violation of RCW 9A.82.060 or 9A.82.080, civil and criminal, incurred by the state or county, including any costs of defense provided at public expense, as appropriate to the state general fund or the antiprofiteering revolving fund of the county.

. . . .

(6) A defendant convicted in any criminal proceeding is precluded in any civil proceeding from denying the essential allegations of the criminal offense proven in the criminal trial in which the defendant was convicted. For the purposes of this subsection, a conviction shall be deemed to have occurred upon a verdict, finding, or plea of guilty, notwithstanding the fact that appellate review of the conviction and sentence has been or may be sought. If a subsequent reversal of the conviction occurs, any judgment that was based upon that conviction may be reopened upon motion of the defendant.

(7) The initiation of civil proceedings under this section shall be commenced within three years after discovery of the pattern of criminal profiteering activity or after the pattern should reasonably have been discovered.

(8) The attorney general or county prosecuting attorney may, in a civil action brought pursuant to this section, file with the clerk of the superior court a certificate stating that the case is of special public importance . . . .

(9) The standard of proof in actions brought pursuant to this section is the preponderance of the evidence test.

The act itself indicates that the Legislature intended the remedies in RCW 9A.82.100 to be civil. The act calls the $250,000 penalty a "civil penalty." RCW 9A.82.100(1)(d). The act creates a civil burden of proof. RCW 9A.82.100(9). The act refers to the "civil proceedings under this section" in the statute of limitations section. RCW 9A.82.100(7). The FINAL LEGISLATIVE REPORT explains that a person injured by racketeering activity may file a "civil action for treble damages" and a "civil penalty of up to $250,000" may be imposed. FINAL LEGISLATIVE REPORT at 140. We conclude the Legislature intended the sanctions contained in RCW 9A.82.100, which include the civil penalty, the treble damages to the victim and reimbursement for the costs of investigation and prosecution, to be civil in nature.

Stein argues that the Legislature considered the statute to be criminal because the sanctions are imposed on the basis of a previous conviction for a crime. We have recently rejected this argument. In *Catlett*, we explained that "[t]he fact that the basis for the civil forfeiture may be criminal activity does not render the forfeiture proceeding either criminal or a resulting forfeiture punishment for double jeopardy purposes. The *Ursery* court held that such linkage was insufficient to render the statute punitive." *Catlett*, 133 Wn.2d at 364-65. We have repeatedly held that the Legislature may provide for both civil sanctions and criminal penalties in the same statute without thereby converting the civil proceeding to a criminal or penal one. *Beckett*

*v. Department of Soc. & Health Servs.*, 87 Wn.2d 184, 188, 550 P.2d 529 (1976), *overruled on other grounds by Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984) (citing *Helvering*, 303 U.S. at 399); *Yakima County Clean Air Auth. v. Glascam Builders, Inc.*, 85 Wn.2d 255, 260, 534 P.2d 33 (1975); *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 278, 510 P.2d 233, 59 A.L.R.3D 1209 (1973)).

A legislature's designation of a penalty as civil is entitled to considerable deference and that designation will not be overborne unless the statute, considered on its face and without reference to the level of sanction imposed in the particular case, is clearly so punitive as to render it criminal despite the legislature's intent to the contrary. *Securities & Exch. Comm'n v. Palmisano*, 135 F.3d 860 (2d Cir. 1998); *Kennedy*, 372 U.S. at 169; *Ursery*, 518 U.S. at 290; *see also Catlett*, 133 Wn.2d at 367. The Court in *Hudson* stated that only the clearest proof of its punitive character will suffice to override legislative intent and transform a sanction labeled civil into one that is criminal. *Hudson*, 522 U.S. at 100 (citing *Ward*, 448 U.S. at 249).

Turning to the second stage of the *Hudson* analysis, a court is to decide whether the statutory scheme was so punitive either in purpose or effect as to transform what was intended as a civil remedy into a criminal penalty. Following the *Hudson* methodology, we look to the *Kennedy* factors. The Supreme Court has explained that the list of considerations "while certainly neither exhaustive nor dispositive," has proved helpful. *Ward*, 448 U.S. at 249. The *Kennedy* factors include: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in

relation to the alternative purpose assigned. *Kennedy*, 372 U.S. at 168-69.

First, the penalties imposed in this case do not involve an "affirmative restraint," such as imprisonment. *See Cole*, 133 F.3d at 806; *Hudson*, 118 S. Ct. at 496; *see also Palmisano*, 135 F.3d 860. Second, the Supreme Court has determined that money penalties have not historically been viewed as criminal punishment. " '[T]he payment of fixed or variable sums of money [is a] sanction which ha[s] been recognized as enforcable [sic] by civil proceedings since the original revenue law of 1789.' " *Hudson*, 118 S. Ct. at 496 (alteration in original) (quoting *Helvering*, 303 U.S at 400); *Cole*, 133 F.3d at 806. The first two factors point toward a conclusion that the sanctions are not criminal in nature. The third factor is more equivocal. The penalties do involve scienter in the sense that the predicate crimes underlying a "pattern of criminal profiteering" require whatever mental element is necessary to the crime, and criminal profiteering is defined as an act or offense committed for financial gain. RCW 9A.82.010(14), (15); 9A.82.100.

The fourth factor is whether the sanction's operation will promote the traditional aims of punishment—retribution and deterrence. The possibility of treble damages to victims and civil penalties to the government, together with the costs of prosecution available under the profiteering act, may serve somewhat as a deterrent. However, the Supreme Court has recognized that all civil penalties will have some deterrent effect. *See Hudson*, 118 S. Ct. at 493. This does not necessarily render them criminal punishments since deterrence " 'may serve civil as well as criminal goals.' " *Hudson*, 118 S. Ct. at 496 (quoting *Ursery*, 116 S. Ct. at 2149). In *Hudson*, the Court held that in the context of the banking industry, government regulation in the form of monetary sanctions to deter fraud and self-dealing is designed to, inter alia, foster public confidence and promote the stability of the banking industry. The Court noted that "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' for

double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation." *Hudson*, 522 U.S. at 105. Similarly, in a recent case using the *Hudson* analysis, the Second Circuit held that the deterrence of securities fraud serves other important non-punitive goals, such as encouraging investor confidence, increasing the efficiency of financial markets and promoting the stability of the securities industry. *Palmisano*, 135 F.3d 860. The Seventh Circuit recently held that under a *Hudson* double jeopardy analysis, civil sanctions for violation of the Commodity Exchange Act, while serving the goal of deterrence, also served the remedial purpose of ensuring the integrity of the commodities markets. *La-Crosse*, 137 F.3d 925.

The Senate report for the federal RICO statute explained that the civil remedies of that act were intended to reach essentially an economic, not a punitive, goal. S. REP. at 81, *cited in Sedima*, 473 U.S. at 529 (Powell, J., dissenting). The State Attorney General, amicus in this case, argues that no legitimate business can compete with criminal profiteering enterprises and that such profiteering injures the economy. The Attorney General argues that the civil RICO statute is remedial because it takes away the illegal profit, restores integrity in the marketplace, and compensates society for the economic harm and the cost of investigating and remedying patterns of crimes committed for economic profit.

The statement of findings that prefaces the federal RICO act indicates that deterrence serves a civil goal as well as a criminal goal:

> "[T]his money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes. . . . [O]rganized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens . . . ."

*United States v. Turkette*, 452 U.S. 576, 588, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) (quoting 84 STAT. 922-23[5]). Similarly, we conclude that under our "little RICO" act, deterrence serves civil as well as criminal goals.

The fifth *Kennedy* factor is whether the behavior to which the sanction applies is already a crime. The sanctions here are imposed for a "pattern" of criminal profiteering and are based on the predicate crimes committed. However, the *Hudson* Court explained that the fact that the same conduct for which a person received a civil money sanction is also criminal in nature is insufficient to render the money penalties criminally punitive in the double jeopardy context. *Hudson*, 522 U.S. at 105 (citing *United States v. Dixon*, 509 U.S. 688, 704, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (rejecting the "same-conduct" test for double jeopardy purposes)); *LaCrosse*, 137 F.3d 925.

The sixth and seventh *Kennedy* factors are whether the penalty is rationally related to an alternative, nonpunitive purpose and whether the penalty is excessive in relation to this alternative purpose. We have considered these two factors to be critical when resolving a double jeopardy claim. *Catlett*, 133 Wn.2d at 367 (citing *In re Young*, 122 Wn.2d at 23). The inquiry focuses on the statute on its face, not on the facts of a particular defendant's case. *Hudson*, 522 U.S. at 101; *Cole*, 133 F.3d at 807 n.4. Our state statute allows for up to treble damages to victims of a pattern of crimes committed for profit, a civil penalty of up to $250,000, and the costs of litigation. RCW 9A.82.100. The primary goal of these damages is to make victims of crime whole, to provide incentive to seek damages, and to reimburse society for the very high costs involved with investigating, prosecuting and seeking recompense in a civil action. Like Congress' intent in enacting the federal RICO act, our state Legislature has sought to take the profit out of organized crime and to place the financial burden on those who engage in repeated crimes for monetary gain.

[5]Organized Crime Control Act of 1970, Pub. L. No. 91-452, 1970 U.S.C.C.A.N. (84 STAT. 922-23) 1073.

The Supreme Court has noted that treble damages, awardable to federal RICO plaintiffs who have been the victims of criminal activity, serve the purpose to give those victims an incentive to litigate. *Sedima,* 473 U.S. at 493. Even in *Halper,* the Supreme Court distinguished between cases where the government seeks a sanction and where a victim seeks damages:

> Finally, nothing in today's opinion precludes a private party from filing a civil suit seeking damages for conduct that previously was the subject of criminal prosecution and punishment. The protections of the Double Jeopardy Clause are not triggered by litigation between private parties.

*Halper,* 490 U.S. at 451; *see also Jines v. Seiber,* 193 Ill. App. 3d 390, 549 N.E.2d 964, 966, 140 Ill. Dec. 313 (1990) (holding that because punitive damages awarded to the victim of an assault are not "essentially criminal" in nature, their imposition does not bar subsequent criminal action under double jeopardy principles).

We noted in *Rice* that the Supreme Court has characterized the federal RICO statute as having "remedial purposes" which are "nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Rice,* 109 Wn.2d at 55 (citing *Sedima,* 473 U.S. at 498). The federal act was described as " 'a major new tool in extirpating the baneful influence of organized crime in our economic life.' " *Sedima,* 473 U.S. at 488 (quoting 116 CONG. REC. at 25190 (1970)). The Supreme Court, in considering the federal RICO act, stated that

> the fact that conduct can result in both criminal liability and treble damages does not mean that there is not a bona fide civil action. The familiar provisions for both criminal liability and treble damages under the antitrust laws indicate as much. Nor are attorney's fees "clearly punitive."

*Sedima,* 473 U.S. at 492.

Our statute allows either the victim, or the State on behalf of the victim, to seek compensatory and punitive

damages. As a practical matter, a private citizen who has been the victim of crime may be afraid to oppose one who has engaged in a pattern of criminal acts. We perceive no prohibition which would stop the Legislature from providing that the Attorney General or a prosecutor may seek damages for the victims of crime. While the State may bring the action, the treble damages are sought on behalf of the victim and it is the victim who is awarded the compensation. RCW 9A.82.100(4)(d). The jury awarded Thelma Lund's estate damages pursuant to the wrongful death cause of action. No issues pertaining to that action are before the Court in this appeal. Pursuant to the Criminal Profiteering Act, the judge awarded additional double damages to the victim's family.[6] The jury awarded damages to Ned Hall, the attorney who was the guardian for Nick Stein and the intended victim of the three murder attempts. The judge imposed treble damages pursuant to statute. Mr. Stein argues that punitive damages are not allowed under Washington law. This is inaccurate. Punitive damages are allowed when expressly authorized by the Legislature. *E.g., Dailey v. North Coast Life Ins. Co.*, 129 Wn.2d 572, 919 P.2d 589 (1996); *Kammerer v. Western Gear Corp.*, 96 Wn.2d 416, 421, 635 P.2d 708 (1981); *Barr v. Interbay Citizens Bank*, 96 Wn.2d 692, 699, 635 P.2d 441, 649 P.2d 827 (1981). We conclude the punitive damages awarded to the victims of a pattern of criminal profiteering serve the nonpunitive purpose of compensating victims for their losses, and the provision for treble damages affords incentive to litigate against the perpetrators. The statutory penalty of treble damages awarded in the court's discretion is not excessive in relation to this alternative purpose.

---

[6]While Stein continues to argue that these damages are excessive, the Court of Appeals already decided that issue and this Court did not accept that issue for review. Thelma Lund was brutally murdered and suffered significantly before she was strangled. In the attempted murders of Ned Hall, the perpetrators attempted to firebomb his home, attempted to lure him out of his house and finally succeeded in entering his house and shooting at him. As the State notes, while it might be in certain circumstances that an award of punitive damages or a civil penalty is so excessive or irrational as to implicate the Eighth or Fourteenth Amendment, or constitute an abuse of discretion, that is not the case here and would not, in any event, implicate the double jeopardy clause.

In light of existing precedent, we also conclude that the portion of the profiteering act allowing a civil penalty not exceeding $250,000 in addition to the cost of the suit does not violate the double jeopardy clause. The Supreme Court has repeatedly held that civil sanctions imposed subsequent to criminal prosecutions will not violate double jeopardy principles when the sanction serves to reimburse or compensate the government for investigatory, detection, prosecution and other costs. We have explained that liquidated damages and double the actual governmental costs do not constitute criminal punishment for the purposes of the double jeopardy bar. This Court has distinguished between civil remedial actions brought primarily to protect the government from financial loss and actions intended to authorize criminal punishment to vindicate public justice. Only the latter subjects a defendant to "jeopardy" within the constitutional sense. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 548-49, 63 S. Ct. 379, 87 L. Ed. 443 (1943). In *Hess*, the Supreme Court explained that after being fined in a criminal action for bidding collusively on public-works projects, it did not violate double jeopardy when plaintiffs in the name of the United States brought an action for a civil penalty including $2,000 per violation plus double the amount of actual damages and the costs of the suit. The *Hess* Court reasoned that the device of double damages plus a specific sum was chosen to make sure that the government would be completely made whole and since the proceedings under the statute were remedial and designed to "protect the government from financial loss"— rather than to "vindicate public justice"—they were civil in nature. *Hess*, 317 U.S. at 551-52, 548-49. *See also Rex Trailer Co. v. United States*, 350 U.S. 148, 76 S. Ct. 219, 100 L. Ed. 149 (1956) (after defendants paid fines in a criminal case for fraudulently purchasing vehicles under the Surplus Property Act, it did not violate double jeopardy when the government brought a civil action for $2,000 per act plus double damages and the costs of suit); *Helvering*, 303 U.S. 391 (after acquittal on tax evasion charges, it did not violate double jeopardy when the government brought

an action to collect a tax deficiency as well as a 50 percent additional penalty because the deficiency sanction was remedial, providing reimbursement to the government for investigatory and other costs of taxpayer fraud).

Even the *Halper* case, which the Supreme Court recently found to have articulated too strict a double jeopardy standard, concluded:

> The relevant teaching of these cases is that the Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages, without being deemed to have imposed a second punishment for the purpose of double jeopardy analysis.

*Halper,* 490 U.S. at 446.

In further discussing what civil sanctions can be imposed in a proceeding which follows a criminal action without violating the double jeopardy bar, the Court explained:

> We acknowledge that this inquiry will not be an exact pursuit. In our decided cases we have noted that the precise amount of the Government's damages and costs may prove to be difficult, if not impossible, to ascertain. *See, e.g., Rex Trailer,* 350 U.S., at 153. Similarly, it would be difficult if not impossible in many cases for a court to determine the precise dollar figure at which a civil sanction has accomplished its remedial purpose of making the Government whole, but beyond which the sanction takes on the quality of punishment. In other words, as we have observed above, the process of affixing a sanction that compensates the Government for all its costs inevitably involves an element of rough justice. Our upholding reasonable liquidated damages clauses reflects this unavoidable imprecision. Similarly, we have recognized that in the ordinary case fixed-penalty-plus-double-damages provisions can be said to do no more than make the Government whole.

*Halper,* 490 U.S. at 449.

In a recent case, the Eleventh Circuit explained that the Supreme Court "emphatically denied any intention to limit the Government to the recovery of direct damages, exclusive

of ancillary costs." *United States v. Barnette*, 10 F.3d 1553, 1559 (11th Cir. 1994). In that case, after the defendant's criminal conviction, the government filed a civil action asserting claims under federal RICO and other theories based on the same conduct for which Barnette was convicted. The Eleventh Circuit held that even a civil sanction which is three times what the defendant's fraud caused the government "simply does not lack a 'rational relation to the Government's loss' " and concluded such a civil penalty did not violate double jeopardy. *Barnette*, 10 F.3d at 1560 (quoting *United States v. Mayers*, 897 F.2d 1126, 1127 (11th Cir. 1990)). Instead, such a ratio is very close to " 'a fixed penalty roughly proportionate to the damage caused . . . plus double damages.' " *Barnette*, 10 F.3d at 1560 (quoting *Halper*, 490 U.S. at 452-53).

The portion of the Criminal Profiteering Act pursuant to which the trial court awarded civil sanctions states:

> In an action filed to prevent, restrain, or remedy a pattern of criminal profiteering activity . . . the court, upon proof of the violation, may impose a civil penalty not exceeding two hundred fifty thousand dollars, in addition to awarding the cost of the suit, including reasonable investigative and attorney's fees.

RCW 9A.82.100(1)(d).

We conclude this damage clause is within the parameters enunciated by the Supreme Court in cases which compensate the government for costs it has incurred because of violations of the law.

We affirm the part of the Court of Appeals decision which upheld the treble damages to the victims of the crimes and other civil damages to the State. We reverse the part of the decision which held that the $250,000 civil penalty violated double jeopardy. The Legislature intended the profiteering act's sanctions which are at issue in this case to be civil in nature. There is not the clearest proof that the statutory scheme was so punitive either in purpose or effect as to transform what was intended as a civil remedy into a crim-

inal penalty. The penalties in the act are civil and therefore double jeopardy principles did not bar the civil action.

DURHAM, C.J., and DOLLIVER, SMITH, and TALMADGE, JJ., concur.

ALEXANDER, J. (dissenting in part) — I dissent in part. In my view, the Court of Appeals was correct in concluding that the trial court's imposition of the $250,000 penalty violated the double jeopardy clause of the state and federal constitutions. Although the Legislature has labeled sanctions imposed pursuant to RCW 9A.82.100(1)(d) a "civil penalty," it is apparent that the legislative declaration does not accurately characterize the penalty that was imposed here. Despite the majority's effort to square the penalty with the seven factors enumerated in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963), in the final analysis its holding that the $250,000 penalty passes constitutional muster is based on its conclusion that the penalty "compensate[s] the government for costs it has incurred because of violations of the law." Majority op. at 861. How the majority reaches that conclusion is beyond me. This so-called "civil penalty" followed on the heels of an award to the State of $223,894.19 for the costs it incurred in investigation and prosecution, and another award of $38,301 for costs, disbursements, and attorney fees. What additional costs did the State incur that are indemnified by the $250,000 penalty? That question is *not* answered by the majority. Indeed, at oral argument before this court, the State was asked that precise question and its counsel was unable to identify any specific costs that the State incurred that were not covered by the specific awards for costs that totaled over $250,000. Its brief is similarly unavailing. The plain fact is that this "civil penalty" of $250,000 serves only to punish and it does not indemnify the State for any costs that it incurred. I would, therefore, affirm the decision of the Court of Appeals in its entirety.

JOHNSON, MADSEN, and SANDERS, JJ., concur with ALEXANDER, J.