986 P.2d 771 (1999)
139 Wash.2d 341
In re the DETENTION OF Elmer CAMPBELL.
Elmer Campbell, Appellant,
v.
State of Washington, Respondent.
No. 63986-8.
Supreme Court of Washington, En Banc.
Argued December 8, 1998.
Decided October 21, 1999.
As Corrected December 14, 1999.
*772 Davis, Wright & Jones, Marshall J. Nelson, Michele Lynn Earl-Hubbard, Seattle, for Amicus Curiae on behalf of Allied Daily Newspapers, Washington Newspaper Publishers Association and the Seattle Times.
Russell Leonard, David Hirsch, Christine Jackson, Public Defender Association, Seattle, Bernadette Foley, Seattle, Anne Englehard, Seattle, for Appellant.
Christine Gregoire, Attorney General, Sarah Coats, and Sarah Sappington, Asst. Attorneys General, Norm Maleng, County Prosecutor, David Hackett, Deputy, Michele Hauptman, Deputy, Appellate Unit, Seattle, for Respondent.
JOHNSON, J.
The petitioner in this case, Special Commitment Center detainee Elmer Campbell, raises a multitude of issues related to his commitment. We are asked to determine whether alleged deficiencies in the care and treatment of persons civilly committed at the Special Commitment Center render the *773 Community Protection Act of 1990, RCW 71.09, unconstitutional. In addition, we must review several rulings issued by the trial court in response to Campbell's pretrial motions, motions in limine, and posttrial motions.

FACTS
Elmer Campbell is currently a resident of the Special Commitment Center (SCC) at McNeil Island. Campbell was committed to prison in 1987 for first degree assault. Originally scheduled to be released from prison in 1993, Campbell was instead civilly committed by a superior court order to the SCC as a sexually violent predator (predator) under RCW 71.09. Campbell moved to dismiss his commitment petition based on his allegation that RCW 71.09 is unconstitutional. Among his several arguments, Campbell asserted that because conditions at the SCC are allegedly unconstitutional, the statute under which he was committed is also unconstitutional. Campbell's motion was denied.
The trial court conducted a probable cause hearing in November 1993, finding probable cause to hold Campbell a predator as defined by RCW 71.09. A jury trial followed in 1994. At trial, victim testimony chronicling Campbell's history of violence and sexual aggression was presented. A state-certified sex offender treatment provider also testified that Campbell suffered from both a mental abnormality and personality disorder that made him likely to reengage in future sexually violent acts.
The jury issued its verdict, finding Campbell a predator as defined by RCW 71.09 and finding the State had proved a less restrictive alternative was not in the best interests of Campbell or the community. Campbell filed a supplemental memorandum, to which he appended United States District Court Judge William Dwyer's order and injunction issued in Turay v. Weston, No. C91-664WD (W.D.Wash.1994). Judge Dwyer, in his order, had found some conditions at the SCC unconstitutional. Judge Dwyer had, therefore, placed the SCC under a remedial injunction.[1]
Following the jury's verdict, judgment was entered to commit Campbell. The trial court then held a hearing on another motion by Campbell to dismiss his commitment petition on the grounds that some of the SCC confinement conditions are unconstitutional. In its deliberation, the trial court relied upon the record of an evidentiary hearing issued by the superior court in In re Young, No. 90-2-21319-6 (King County Super. Ct., Wash. 1993), on remand from our decision in In re Personal Restraint of Young, 122 Wash.2d 1, 857 P.2d 989 (1993), as well as supplemental testimony. The trial court issued findings of fact and conclusions of law on Campbell's motion. The court agreed with Campbell that certain conditions at the SCC were unconstitutional. The court, however, declined to release him. Instead, the court required the State to submit a proposal for remedying conditions at the SCC, setting a new deadline for compliance. The trial court also granted permission to the Department of Social and Health Services (DSHS) to intervene in the case for the purpose of contesting personal jurisdiction.
The trial court issued its final order on Campbell's motion on March 7, 1995. The court again refused to grant Campbell's motion to dismiss his commitment petition but did affirm Campbell's motion that some of the conditions at the SCC violated both the state and federal constitutions. The court required the State join in the remediation program ordered by the United States District Court in Turay.
Campbell timely appealed to this court and we granted review. We affirm our 1993 decision in Young, 122 Wash.2d 1, 857 P.2d 989, upholding the constitutionality of RCW 71.09. We also affirm Campbell's order of commitment.

ANALYSIS

I.
RCW 71.09.060, in its present form, requires that whenever a court or a 12-person *774 jury unanimously finds a person to be a sexually violent predator and a less restrictive alternative to total commitment is inappropriate, that person must be placed in the custody of DSHS. DSHS must provide that person with social and health services for control, care, and treatment at a secure facility operated by DSHS. This care and treatment must be adequate under the statute. RCW 71.09.060.
On appeal, Campbell raises the argument that because some of the SCC conditions of care are inadequate, his detention is criminal rather than civil in nature and, therefore, violates his right to substantive due process and protections against ex post facto laws or double jeopardy. Campbell reasons if some of the SCC conditions are unconstitutional, those unconstitutional conditions render RCW 71.09 unconstitutional as well.
At his 1994 trial, Campbell advanced this theory when he filed a motion requesting the trial court dismiss his commitment petition and release him from the SCC on the grounds that some SCC conditions were allegedly unconstitutional. In response, the trial court ruled while some of the SCC conditions did not meet constitutional muster, the appropriate remedy was not Campbell's release but, rather, a court order to the State mandating development of a remedial plan to improve SCC conditions.
The State, in turn, argued against the jurisdictional legitimacy of the trial court's remedial order. The State maintained the trial court lacked personal jurisdiction over the SCC's managing state agency, DSHS. Upon consideration of the State's motion, the court found it possessed both personal and subject matter jurisdiction over DSHS, dismissing the State's argument, and affirming the court's order. Campbell then argued again that the trial court, having found the SCC conditions unconstitutional, should likewise find RCW 71.09 itself unconstitutional. The trial court denied Campbell's request.
In arguing the SCC's conditions of care render RCW 71.09 criminal rather than civil in nature, Campbell attempts to relitigate an issue we have already resolved. In analyzing the constitutionality of RCW 71.09 in Young, we also examined the issue of whether "the Statute violates due process because ... constitutionally required treatment is precluded due to the conditions of confinement." Young, 122 Wash.2d at 26, 857 P.2d 989 (emphasis added). In Young, this court held the legislative intent of the statute is not to punish detainees and RCW 71.09 is civil, not criminal, in nature in both "purpose and effect." Young, 122 Wash.2d at 18-25, 857 P.2d 989 (emphasis added). We stated, "RCW 71.09 ... does not violate either the prohibition against ex post facto laws or the double jeopardy clause. We further hold, after a searching inquiry, that the basic statutory scheme implicates no substantive due process concerns." Young, 122 Wash.2d at 59, 857 P.2d 989.
Because fundamental rights were at issue in Young, we employed a strict scrutiny test to determine if either RCW 71.09 or the SCC's conditions violate the detainees' rights. Young, 122 Wash.2d at 26-27, 857 P.2d 989. Under a strict scrutiny analysis, the statute at dispute has to both serve a compelling state interest and be narrowly drawn. Young, 122 Wash.2d at 26, 857 P.2d 989. We found RCW 71.09 does both. Indeed, we have found it "irrefutable" that RCW 71.09, by treating the mentally ill and removing sexual predators from society, serves a compelling state interest. Young, 122 Wash.2d at 26, 857 P.2d 989. The principle of stare decisis compels this court to uphold our decision in Young unless Campbell can prove doing so would be incorrect and harmful. Key Designs, Inc. v. Moser, 138 Wash.2d 875, 882, 983 P.2d 653 (1999) (citing State v. Berlin, 133 Wash.2d 541, 547, 947 P.2d 700 (1997)).
Campbell cites no precedent for the proposition that whenever a statute is unconstitutionally administered, such flawed administration renders the statute itself unconstitutional. Indeed, the State correctly notes that "[Campbell's] argument confuses the issue of a committed individual's due process rights following a valid commitment under the Statute with the analysis of whether the Statute's scheme for involuntary commitment is constitutional." Br. of Resp't at 21.
*775 We have held, in order to evaluate a statute's constitutionality, a court's task is to look at the statute on its face, not whether it is adequately applied. Winchester v. Stein, 135 Wash.2d 835, 959 P.2d 1077 (1998). Winchester expressly noted that "[t]he focus... is on the sanction allowed by the statute, not the actual sanction imposed in a particular case." Winchester, 135 Wash.2d at 847, 959 P.2d 1077. Finally, we iterated the principle that:
A legislature's designation of a penalty as civil is entitled to considerable deference and that designation will not be overborne unless the statute, considered on its face and without reference to the level of sanction imposed in the particular case, is clearly so punitive as to render it criminal despite the legislature's intent to the contrary.
Winchester, 135 Wash.2d at 853, 959 P.2d 1077 (emphasis added).
Even assuming Campbell may properly challenge the validity of his order of commitment based upon the conditions of confinement at the SCC, but see In re Detention of Turay, 139 Wash. 379, 413-20, 986 P.2d 790, 808-812 (1999) (conditions of confinement do not implicate legality of commitment order), Campbell has failed to prove the conditions of confinement are punitive, so as to render the statute unconstitutional as applied to him.
To the extent Campbell's claim is proper, he must show by "`the clearest proof' that `the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' that the proceeding be civil...." Allen v. Illinois, 478 U.S. 364, 369, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (quoting United States v. Ward, 448 U.S. 242, 248-49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Thus, the question is not simply whether the conditions of confinement are constitutionally inadequate in certain respects, but whether these constitutional infirmities transform Campbell's civil detention into "punishment," thereby rendering the statute "criminal" as applied. Allen, 478 U.S. at 374, 106 S.Ct. 2988. See also Young v. Weston, 176 F.3d 1196, 1200 (9th Cir.1999) (RCW 71.09 is unconstitutional as applied only if petitioner can prove "the punitive nature of his confinement").[2]
Despite the fact it found certain inadequacies in the conditions and care at the SCC, the trial court in this case specifically ruled that failure to provide constitutionally adequate care and treatment did not render the statute punitive as applied. The court reasoned that where "the treatment deficiencies are subject to remediation and are being corrected, respondents have failed to prove that they are `confined under conditions incompatible with the state's asserted interest in treatment." CP at 2048 (quoting Allen, 478 U.S. at 373, 106 S.Ct. 2988). We note the federal district court has similarly declined to find the conditions of confinement are so punitive as to require release, but continues to monitor progress towards compliance with its injunction to remedy any constitutional defects in the administration of the SCC.
The Wisconsin Court of Appeals dismissed an argument similar to that presented here when the court reviewed that state's application of Wisconsin's sexually violent predator law:
[T]he State argues persuasively that even if [the detainee] were correct that the Center failed to develop a treatment program for his special needs, [the detainee's] conclusion that he should be released would place society at risk for his acts of sexual violence and produces an absurd result. Rather, [the State] argue[s], his remedy is to litigate that issue and, if successful, obtain appropriate treatment, not supervised release.
In re Seibert, 220 Wis.2d 308, 320, 582 N.W.2d 745 (Wis.Ct.App.), review denied, 220 Wis.2d 366, 585 N.W.2d 158 (1998).
*776 In sum, we do not find that Campbell has sufficiently proven the conditions of confinement at the SCC constitute punishment so as to render RCW 71.09 criminal in nature and unconstitutional as applied to him. We agree with the trial court that the proper relief under the circumstances is to remedy any constitutional defects in the administration of the SCC. Remediation is already ongoing under the direction of the federal district court. Accordingly, Campbell's detention under the statute is affirmed.

II.
On June 21, 1993, the State filed its petition for Campbell's commitment under RCW 71.09. At that time, there was no requirement that a probable cause hearing under RCW 71.09 be held within 72 hours, as required for hearings under RCW 71.05 (involuntary commitment statute).
On September 21, 1993, this court issued a mandate in Young, requiring a probable cause hearing under RCW 71.09 be held within 72 hours. Young, 122 Wash.2d at 42-47, 857 P.2d 989. Campbell now alleges the trial court erred in denying his motion to dismiss his petition based on the court's failure to hold a probable cause hearing within 72 hours of Young's issuance.
We deny Campbell's claim on three grounds: (1) he had already been brought before a court to contest his detention, so a probable cause hearing within 72 hours was not necessary in his case; (2) Campbell failed to request such a hearing within the 72-hour time period after the issuance of Young and, thereby, effectively waived any objections; and (3) even if, arguendo, an earlier hearing had been held, it would not have changed the ultimate outcome of Campbell's trial.
Campbell's appearance before a judge predates this court's ruling in Young. In Young, the petitioner detainees had been denied any opportunity to appear before a court and challenge probable cause. We corrected this procedural infirmity, mandating in Young that any potential detainees brought under RCW 71.09 have "an opportunity to appear and respond to the petition for commitment...." Young, 122 Wash.2d at 46, 857 P.2d 989.
In Campbell's case, unlike that of the petitioner detainees in Young, Campbell did appear before a superior court judge to contest the constitutionality of his commitment approximately 30 days after his petition was filed. He, therefore, was given an opportunity to appear and respond to the petition for commitment even prior to our mandate in Young.
Also, Campbell's failure to timely request a hearing effectively waives any future objections he might frame as to the timing of his second probable cause hearing. Campbell's second probable cause hearing was held approximately four weeks after the mandate issued under Young. "[A] trial court is not required to anticipate an issue on behalf of the defense. The burden is upon the defendant to request a ... hearing. In the absence of a request, there is no error." State v. Gould, 58 Wash.App. 175, 185, 791 P.2d 569 (1990). Campbell should have timely raised his objection.
Finally, even if there were any error in the timing of Campbell's probable cause hearing, such error was harmless and does not justify dismissal. In Young, we also held, although the petitioner detainees had been deprived of a 72-hour probable cause hearing, that deprivation had no bearing on the outcome of their respective trials. "While this requirement [72-hour probable cause hearing] was not complied with here, it had no bearing on the ultimate outcome of petitioners' trials; thus the omission in this instance does not require reversal." Young, 122 Wash.2d at 47, 857 P.2d 989. Thus, we held that, absent a possible change in the outcome, prior deprivation of a 72-hour probable cause hearing did not warrant reversal. Since Campbell has failed to show that the trial court's failure to hold a probable cause hearing within 72 hours in any way adversely affected the outcome of his case, his claim must be denied under Young.

III.
Campbell next argues that, under our decision in Young, the State was required at trial *777 to prove that less restrictive alternatives to commitment were considered and rejected.
We deny Campbell's claim because the Legislature amended RCW 71.09's definition of a sexually violent predator to exclude those persons amenable to treatment in a less restrictive setting after Campbell's probable cause hearing. Following the passage of the 1995 amendments to RCW 71.09, the possibility of alternatives less restrictive than total confinement have been mandatory at RCW 71.09 probable cause hearings.
Moreover, any error in Campbell's particular case was cured when the State filed an amended petition alleging the absence of any less restrictive alternative than commitment for Campbell before Campbell's trial began. The jury unanimously found, beyond a reasonable doubt, that no less restrictive alternative than complete commitment would be sufficient to keep both Campbell and the community safe.

IV.
Campbell argues RCW 71.09 creates a lower standard of commitment for sexually violent predators than is required for other persons facing civil commitment because RCW 71.09 does not require the signatures of two physicians or of one physician and one mental health professional, as is the case for involuntary commitment under RCW 71.05.
Campbell's reasoning is flawed. The burden of proof required from the State for commitment under RCW 71.05 is clear, cogent, and convincing evidence. RCW 71.05.310. Under RCW 71.09, a person can be committed only after a full trial is held on the issue of whether that person meets the definition of a sexually violent predator. RCW 71.09.060. The burden of proof for the State under RCW 71.09 is the most stringent possible: proof beyond a reasonable doubt.
Moreover, the question of who is required to sign a commitment petition under RCW 71.09 and RCW 71.05 is a matter rationally related to the very different populations facing commitment under the two types of involuntary commitment. Commitment under RCW 71.09 pertains only to persons previously charged with, or convicted of, a sexually violent offense as defined by RCW 71.09.020(6). Thus, the commitment determination requires the expertise necessary to conduct a comprehensive legal analysis of each subject's criminal history. This is not the case under RCW 71.05. Determining whether a person's criminal history demonstrates that the person falls within the purview of RCW 71.09 is best done by a legally trained professional, not a physician or a mental health professional. Thus, the two populations facing commitment under these two commitment statutes are not similarly situated and the procedural differences related to what kind of expert must sign a commitment petition is rationally related to those differences.

V.
Campbell claims the trial court erred when it included the State's certification for probable cause in its deliberations on whether Campbell had the prior convictions necessary for civil commitment under RCW 71.09. Campbell argues the rules of evidence for commitment under RCW 71.09 should be identical to those for involuntary commitment under RCW 71.05.
Again, the rationale for the differences in procedure between the two statute's implementation is related to disparities between the two dissimilar populations facing commitment under the statutes. As this court held in Young, "[t]he mental abnormalities or personality disorders involved with predatory behavior may not be immediately apparent." Young, 122 Wash.2d at 52, 857 P.2d 989. Thus, an expert's determination whether to detain a person under RCW 71.09 oftentimes requires a more intense review of substantial records. He or she must also interview the subject, conduct psychological evaluations, and refer to literature on recidivism.
The Legislature recognized the extensive review required for commitment under RCW 71.09 and, therefore, allowed a 45-day period under that statute for evaluation of potential detainees by qualified DSHS professionals. This probable cause hearing stage of the proceedings is not a commitment trial; it is merely a preliminary determination *778 stage prior to the commitment trial. Its purpose is to prevent wrongful detention during the 45-day evaluation period prior to the commitment trial. Such a proceeding is most similar to the probable cause or pretrial release hearing held in criminal cases, neither of which require application of the rules of evidence. ER 1101(c)(3). This analysis is supported by State v. Anderson, 33 Wash. App. 517, 655 P.2d 1196 (1982), which held that disposition hearings under the sexual psychopath statute were analogous to other criminal and civil hearings and specifically exempted from the rules of evidence under ER 1101. Anderson, 33 Wash.App. at 519-20, 655 P.2d 1196. See also People v. Mercer, 70 Cal.App.4th 463, 82 Cal.Rptr.2d 723 (1999) (the standard for reviewing the sufficiency of the evidence for commitment under California's sexually violent predator act is the same as the standard for a criminal conviction).

VI.
Campbell argues the trial court violated his privacy rights by keeping the courtroom open during his trial and not sealing his court file. The State counters that Campbell's privacy interests should be balanced against the greater weight of both legal requirements and public policy interests for keeping commitment proceedings and files open.
There is a constitutional principle that both civil and criminal case proceedings are open to the public. Washington Constitution article I, section 10 requires that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." Therefore, proceedings under RCW 71.09 allow public access. Closure of such proceedings must be affirmatively mandated by statute or where there is a serious and imminent threat to some important issue. "We adhere to the constitutional principle that it is the right of the people to access open courts where they may freely observe the administration of civil and criminal justice." Allied Daily Newspapers v. Eikenberry, 121 Wash.2d 205, 211, 848 P.2d 1258 (1993); see also Cohen v. Everett City Council, 85 Wash.2d 385, 388-89, 535 P.2d 801 (1975).
Campbell's right to nondisclosure of intimate personal information by the State is not a fundamental right and is subject to diminishment when there is a legitimate state interest at stake. O'Hartigan v. Department of Personnel, 118 Wash.2d 111, 117, 821 P.2d 44 (1991). Case law recognizes that sex offenders threaten public safety and, therefore, have reduced privacy interests: "`Persons found to have committed a sex offense have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government.' " State v. Ward, 123 Wash.2d 488, 502, 869 P.2d 1062 (1994) (quoting Laws of 1990, ch. 3, § 116).
The public has an undeniably serious interest in maintaining current and thorough information about convicted sex offenders. The specific modus operandi of sex offenders, preying on vulnerable strangers or grooming potential victims, is markedly different from the behavior of other types of persons civilly committed and such dangerous behavior creates a need for disclosure of information about convicted sex offenders to the public. Grave public safety interests are involved whenever a known sex offender's tendency to recommit predatory sexual aggressiveness in the community is being evaluated. This substantial public safety interest outweighs the truncated privacy interests of the convicted sex offender.

VII.
Campbell argues the trial court erred in admitting the testimony of Roger Wolfe because, Campbell alleges, such testimony is unreliable. We disagree.
Wolfe holds a Masters in Psychology and is a licensed psychological affiliate which permits him to practice independently. In addition, Wolfe holds a special certification as a sexual offender treatment provider that requires over 2,000 hours of actual sexual offender treatment and evaluation within the last seven years. (Washington is the first state to require such a license). Wolfe has served as codirector of Northwest Treatment Associates for over 20 years. For over 25 *779 years he has specialized in the evaluation and treatment of sex offenders.
The State requested Wolfe assess whether Campbell fell under the category of a sexually violent predator as defined in RCW 71.09. In order to meet this request, Wolfe met with Campbell and administered psychological testing on him. He also extensively reviewed Campbell's criminal and penal record.
Wolfe diagnosed Campbell as having a mental abnormality and a personality disorder that pointed towards the likelihood of Campbell committing future acts of a sexually violent and predatory nature. Wolfe evaluated Campbell as suffering from the condition of "paraphilia." Paraphilia is characterized as having repetitive urges, impulses, and sexually arousing fantasies of rape. Wolfe testified that paraphilia is not curable through the passage of time alone; cure requires intensive intervention. In fact, Campbell admitted to his own mental health expert that he had formed rape fantasies in his mind subsequent to his last conviction. Campbell's criminal history also demonstrated that, in the past, he committed sexually aggressive acts shortly after he was released from custody.
Following his examinations of Campbell and based on Campbell's record, Wolfe testified Campbell was more likely than not to reoffend in a sexually violent and predatory manner if he were released. Finally, Wolfe testified that community release, a less restrictive alternative to confinement, was not a viable alternative for Campbell because the risk to the community at large was too great. Wolfe has continued to monitor Campbell's progress while Campbell has been committed at the SCC and Wolfe has stated he has seen no progress that would cause him to reassess his trial testimony as to Campbell's condition or dangerousness.
Campbell does not raise on appeal that Wolfe's professional training and experience in the area of evaluating and treating sex offenders is inadequate. Rather, he generally questions the ability for anyone to "predict dangerousness." Both this court in Young, 122 Wash.2d at 56-58, 857 P.2d 989, and the United States Supreme Court in Barefoot v. Estelle, 463 U.S. 880, 896-903, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), have specifically rejected this kind of argument.[3]See also In re Detention of Aguilar, 77 Wash.App. 596, 601-02, 892 P.2d 1091 (1995) (affirming admission of expert testimony predicting dangerousness of sexual predator). Moreover, Wolfe's testimony was subjected to cross-examination by Campbell's counsel at trial and the jury was given the opportunity to hear testimony from Campbell's own expert countering Wolfe's testimony. "The differences in opinion go to the weight [of the evidence] and not the admissibility of such testimony.... Such disputes are within the province of the jury to resolve." Barefoot, 463 U.S. at 902, 103 S.Ct. 3383 (alteration in original) (quoting Barefoot v. Estelle, No. W-81-CA-191 (W.D.Tex. Nov. 9, 1982)).

VIII.
Campbell claims the trial court committed reversible error by impermissibly commenting on the evidence when it read jury instruction 31. That instruction reads: "The laws of the State of Washington contain no provisions for regaining custody of a person who has been determined to be a sexually violent predator and who leaves the state without authorization, whether on a less restrictive alternative or otherwise." Clerk's Papers at 1190.
Washington Constitution article 4, section 16 "prohibits a judge from conveying to the *780 jury his or her personal belief in the merits of a case." State v. Stearns, 61 Wash.App. 224, 231, 810 P.2d 41 (1991). However, "[a]n instruction does not impermissibly comment on the evidence when there is sufficient evidence in the record to support it and it is an accurate statement of the law." Stearns, 61 Wash.App. at 231, 810 P.2d 41.
Campbell does not assert the judge incorrectly stated the law when jury instruction 31 was read; rather, he claims the evidence does not support the instruction. Campbell's ability to respond favorably to treatment in a less restrictive setting than the SCC was an issue comprehensively covered at trial. Both sides presented experts debating this point to the jury. Campbell's own expert affirmed that, if released into the community, Campbell would have no incentive to stay in Washington. He also acknowledged if Campbell left the state, the law could not force him to return. When Campbell's attorney objected to this testimony, the court asked his counsel if Campbell preferred the court instruct the jury as to the law on this matter and counsel responded, "yes."
Jury instruction 31 correctly stated the law and was supported by evidence in the record. It was not an impermissible comment on the evidence.

IX.
Campbell claims two of his prior convictions, his 1985 conviction for indecent liberties by forcible compulsion and his 1981 juvenile conviction for lewd and lascivious acts upon the body of a minor, are constitutionally invalid on their faces. As such, Campbell contends evidence of these prior convictions was improperly admitted at trial.
We held in Young that the State may introduce prior convictions without proving their constitutional validity in appropriate circumstances. Young, 122 Wash.2d at 54, 857 P.2d 989. However, the court also determined a prior conviction is inadmissible when it is constitutionally invalid on its face. The court, quoting State v. Ammons, 105 Wash.2d 175, 188, 713 P.2d 719, 718 P.2d 796 (1986), defined a facially unconstitutional conviction as thus: "`Constitutionally invalid on its face means a conviction which without further elaboration evidences infirmities of a constitutional magnitude.'" Young, 122 Wash.2d at 54-55, 857 P.2d 989.
Campbell categorically states that his 1981 offense "did not prove a conviction." Br. of Appellant at 71. He does not elaborate and an examination of the record does not support Campbell's argument. Campbell fails to intelligibly argue his claim on this issue.
Campbell argues the plea document for his 1985 conviction "fails to include each element of the crime." Br. of Appellant at 71. Again, Campbell fails to specify further. Campbell's 1985 statement of the guilty plea adequately supports, on a factual basis, the trial court's finding that Campbell acted knowingly and for the purposes of his sexual gratification. That statement reads: "On or about May 8th in Yakima County I accosted a woman in the woman's bathroom at the Yakima Mall. I had a knife and I made the woman take off part of her clothing. I made her touch my penis." Report of Proceeding at 39 (May 5, 1994). Campbell's statement supports the plea. The conviction is constitutional.

X.
Campbell argues when the State used his 1985 conviction as part of his civil commitment proceeding it rendered his plea in that conviction involuntary. He argues such use of his plea by the State violated the 1985 plea agreement.
A defendant negotiating a plea arrangement does not need to be advised of the collateral, as distinguished from the direct, consequences of his or her plea. Ward, 123 Wash.2d at 512-15, 869 P.2d 1062 (sex offender registration is a collateral consequence of pleading guilty to a sex offense); In re Personal Restraint of Paschke, 80 Wash.App. 439, 909 P.2d 1328 (1996) (civil commitment under the sexually violent predator act is a collateral consequence of a guilty plea to a sexually violent offense). A direct consequence of a plea has a "`definite, *781 immediate and largely automatic effect on the range of the defendant's punishment.'" In re Paschke, 80 Wash.App. at 444, 909 P.2d 1328 (emphasis added) (quoting Ward, 123 Wash.2d at 512, 869 P.2d 1062).
We held in Young that commitment under RCW 71.09 is not criminal punishment but, rather, civil commitment. It was not a foregone conclusion that Campbell would be civilly committed after his criminal confinement for the 1985 conviction. In fact, he was released after he served out that sentence. Following that release, however, Campbell almost immediately reoffended in 1987. It was after he served his time for the 1987 conviction that a civil commitment trial was held under RCW 71.09. Thus, Campbell's civil commitment trial cannot be said to be a direct consequence flowing from his 1985 conviction; it is merely a collateral consequence.

CONCLUSION
Campbell has failed to adequately support and prove his profusion of claims. For the reasons set forth above, we hold that Campbell's order of commitment was proper. Affirmed.
GUY, C. J., and SMITH, ALEXANDER, TALMADGE, JJ., and DOLLIVER, J. Pro Tem., concur.
SANDERS, J. (dissenting).
I dissent because the remedy for unconstitutional confinement is release; and expert opinion testimony predicting reoffense is inadmissible where the scientific community has not accepted the reliability of the underlying principles upon which it is based. For dispositive authority I rely upon Young v. Weston, 176 F.3d 1196 (9th Cir.1999), amended by 192 F.3d 870 (9th Cir.1999) (hereinafter "amended (Sept. 16, 1999)"). I posit the majority's ultimate rationale is the result it seeks, not the legal principles which should guide its inquiry.

I.

Remedy for Unconstitutional Confinement is Release
The trial court found procedures employed by the Special Commitment Center (SCC) were "more punitive than that afforded incarcerated criminals in violation of respondents' substantive due process rights." Clerk's Papers (CP) at 2043. Nevertheless, the trial court refused to release Campbell because "the treatment deficiencies are subject to remediation...." CP at 2048. As a result, Campbell was consigned by the trial court to remain in unconstitutional confinement based on the legal conclusion that if unconstitutional conditions are capable of correction the unconstitutional incarceration may continue notwithstanding violation of constitutional rights of the prisoner.
The majority acknowledges Campbell is held under unconstitutionally punitive conditions (Majority at 773), but likewise denies him release from custody pursuant to his petition for writ of habeas corpus. Majority at 773, 776. It defends this bizarre result by failing to acknowledge (1) a facially valid statute may nevertheless be unconstitutionally applied and (2) where unconstitutional conditions of confinement render the confinement itself unconstitutional, and there is no alternative constitutional confinement, the habeas corpus remedy is release.
Challenge is As-Applied.
Most fundamentally, the majority confuses a facial challenge to the validity of a statute with a challenge to the way it is applied in fact. Campbell's claim is as-applied:
Dismissal is required because the State's punitive conduct towards Mr. Campbell rendered the Statute as applied to him unconstitutionally excessive.
Br. of Appellant at 25. An as-applied challenge puts at issue not the facial validity of the statute but rather the alleged unconstitutional application of the statute to the prisoner. Compare In re Detention of Turay, 139 Wash.2d at 415 n. 27, 986 P.2d at 809 n. 27 (1999). It is specifically not Campbell's claim, although the majority would mischaracterize it, that "unconstitutional conditions *782 render the sentencing[[1]] statute, RCW 71.09, unconstitutional ...," Majority at 774, at least in the sense he does not deny the statute could be constitutionally applied although it is not here. See also Majority at 772. Campbell's as-applied claim is thus identical to that asserted in Young, where Young, imprisoned under the identical Washington sex predator statute, appealed the district court's denial of his petition for writ of habeas corpus, claiming entitlement to release based upon the punitive nature of his confinement.
In Young the United States Court of Appeals reversed dismissal of the writ, remanding for a fact-finding hearing, holding:
[I]f Young's confinement pursuant to the Washington statute is punitive, then the statute, as applied to Young, violates the ex post facto and double jeopardy clauses of the United States Constitution.
Young, 176 F.3d at 1199, amended (Sept. 16, 1999).
Campbell's claim, and the facts supporting it, are indistinguishable from Young's with one important exception: The lack of treatment and punitive nature of Campbell's confinement has been factually established by the trial court, is not challenged on appeal, and is therefore a verity for the purpose of our review. Riley v. Rhay, 76 Wash.2d 32, 33, 454 P.2d 820 (1969); State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994).
Unlike today's majority, the United States Court of Appeals recognized the difference between unconstitutional incarceration which results from the misapplication of an otherwise facially valid statute and unconstitutional incarceration which results from a facially invalid statute. Citing the Washington State Supreme Court in In re Personal Restraint of Young, 122 Wash.2d 1, 857 P.2d 989 (1993) and the United States Supreme Court in Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), which found the Washington statute, and one nearly identical to it, facially constitutional, the Court of Appeals cautioned neither would "preclude the possibility that the Washington statute, as applied, is punitive." Young, 176 F.3d at 1199, amended (Sept. 16, 1999). This is in keeping with the role of the judiciary to pronounce judgment on the special cases before it and not upon general principles, except by consequence. See City of Chicago v. Morales, ___ U.S. ___, 119 S.Ct. 1849, 1867-1871, 144 L.Ed.2d 67 (1999) (Scalia, J., dissenting). To answer the as-applied question properly, held the Court of Appeals, the court must look to the actual conditions of confinement in order to determine whether the resulting incarceration is constitutional. Young, 176 F.3d at 1199 n. 4 ("In cases considering the question whether confinement is criminal or civil, the Supreme Court has always looked to the actual conditions of confinement." (citing Hendricks, 521 U.S. at 361-67, 117 S.Ct. 2072; Allen v. Illinois, 478 U.S. 364, 373-74, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986); and Bell v. Wolfish, 441 U.S. 520, 535-39, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1970))), amended (Sept. 16, 1999).
Both Hendricks, 521 U.S. 346, 117 S.Ct. at 2082, 138 L.Ed.2d 501, and Young, 122 Wash.2d at 35, 857 P.2d 989, considered only a facial challenge to the statute, expressly reserving an as-applied challenge. A facial challenge will succeed only if the statute cannot, under any conceivable set of circumstances, be valid. United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Of course one can "conceive" of a program which provides treatment in a therapeutic, nonpunitive setting; however, imagination often exceeds reality.
Given this test, the task to prove a statute facially invalid is a difficult one; however, the burden to prove an unconstitutional application of even a facially valid statute is by a mere preponderance of the evidence. So held the trial court, citing with approval Landman v. Royster, 333 F.Supp. 621, 637 (E.D.Va.1971) (Prisoner's due process challenge *783 to administration of prison disciplinary system held subject to burden of proof by a preponderance.); cf. In re Personal Restraint of Powell, 117 Wash.2d 175, 184, 814 P.2d 635 (1991) (In a collateral attack, petitioners "must show by a preponderance of the evidence that a constitutional error has caused them actual prejudice."); and State v. S.H., 75 Wash.App. 1, 20, 877 P.2d 205 (1994) (In a personal restraint petition to challenge whether a juvenile is receiving adequate sex offender treatment at a facility, respondent must show by a preponderance of the evidence that a statutory or constitutional violation has caused him actual prejudice.). CP at 2043-44.
The majority continues: "To the extent Campbell's claim is proper, he must show by `the clearest proof' that `the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' that the proceedings be civil ...." (alterations in original) (quoting Allen v. Illinois, 478 U.S. 364, 369, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986)). Majority at 775. Allen supports the position advanced by Campbell because Campbell has in fact proved the punitive nature of his confinement to the trial court's satisfaction by the clearest proof. This was the exact prospect foreseen in Young v. Weston, amended, 192 F.3d at 874 (Sept. 16, 1999) ("[W]e conclude that Young has alleged sufficient facts that, if proved, would constitute such `clear proof.'").
In Allen the State of Illinois sought civil commitment of Terry B. Allen pursuant to its Sexually Dangerous Persons Act. Allen was interviewed by the state psychiatrist who testified against him at the time of trial over Allen's objection based upon the self-incrimination clause of the Fifth Amendment. Acknowledging the privilege against self-incrimination does not pertain to civil proceedings, Allen claimed the Illinois statute was substantively criminal on its face. Rejecting the facial claim, the Supreme Court opined,
Had petitioner shown, for example, that the confinement of such persons imposes on them a regimen which is essentially identical to that imposed upon felons with no need for psychiatric care, this might well be a different case. But the record here tells us little or nothing about the regimen at the psychiatric center, and it certainly does not show that there are no relevant differences between confinement there and confinement in the other parts of the maximum-security prison complex. Indeed, counsel for the State assures us that under Illinois law sexually dangerous persons must not be treated like ordinary prisoners. We therefore cannot say that the conditions of petitioner's confinement themselves amount to "punishment" and thus render "criminal" the proceedings which led to confinement.
Allen, 478 U.S. at 373-74, 106 S.Ct. 2988 (citation to record omitted).
The distinction drawn in Allen between a commitment statute civil on its face yet punitively applied in practice is precisely the distinction urged by Campbell but ignored by this court's majority. Here the trial court found the actual conditions of confinement were more punitive than prison. CP at 2048.
Our majority confuses the factual findings of the trial court that the terms and conditions of Campbell's confinement were punitive ("more punitive than that afforded incarcerated criminals," CP at 2043) with the trial court's legal conclusion (which we must review on appeal) "that failure to provide constitutionally adequate care and treatment did not render the statute punitive as applied." Majority at 775. To extend this purported rule of law, a civil committee confined to a dungeon, denied treatment, and flogged on a daily basis would not be entitled to release because the "deficiencies are subject to remediation" (Majority at 775 (quoting trial court, CP at 2048)), even though the "deficiencies" have not in fact been remediated.
In Young the United States Court of Appeals rejected this argument, holding Young was entitled to a factual hearing on his habeas corpus petition concluding his allegations of punitive confinement as a matter of law entitled him to release if factually proved:
We hold that Young alleged facts which, if proved, would establish the punitive nature of his confinement and would entitle him to relief. *784 Young, 176 F.3d at 1200, amended (Sept. 16, 1999).
While the majority in the companion case of In re Detention of Turay, 139 Wash.2d 379, 986 P.2d 790 (1999) admittedly cannot distinguish but still refuses to follow Young ("This court is, of course, not bound by that decision and ... we decline to follow it."), the majority here attempts to distinguish it. Yet, at the same time this majority acknowledges Young is entitled to relief on remand if he proves "his conditions of confinement are so punitive as to constitute punishment." Majority at 775 n. 2. Campbell is entitled to that relief now based on the findings of the trial court in this record.
Although the majority does not remand for further factual findings (unlike Young,) I agree remand is unnecessary here because the trial court adopted numerous findings, not challenged on appeal, detailing the absence of treatment in an extremely punitive environment. Although the majority opinion unaccountably says nothing about the specific conditions of confinement, it concludes Campbell has "failed to prove the conditions of confinement are punitive." Majority at 775. I will therefore assist by referencing the record and findings of the trial court.
The SCC is operated by the Department of Social and Health Services, but is housed entirely within a Department of Corrections (DOC) prison facility. CP at 1949. Because the SCC shares a physical facility with the DOC, the SCC is dependent on DOC for many services including shared use of the law library and visiting rooms, and medical and meal services. CP at 1949. The SCC "residents" are frequently and unknowingly monitored by electronic surveillance equipment. CP at 1949-50. Space limitations and some elements of facility design render the SCC more restrictive than DOC facilities. CP at 1950.
The DOC provides the SCC with back-up emergency security. CP at 1950. SCC has called DOC staff for a "show of force" against residents on at least six occasions. CP at 1950. DOC perimeter guards are permitted to shoot SCC residents who attempt to escape from the facility. CP at 1950. The SCC "resident security classification system" purports to measure an inmate's security risk, but includes nonrelevant factors such as an inmate's commitment to the treatment program. CP at 1950-51.
All SCC residents are subjected to stringent security measures. For example, residents are observed when they use the restroom, often by female staff. CP at 1951-52. Residents are strip-searched any time they leave and return to the SCC facility, even though they are under constant armed surveillance when traveling. CP at 1952. Residents are subjected to "pat down" searches after every visit and when they leave the unit for another part of the building. CP at 1952. All residents' rooms have been subjected to arbitrary searches. CP at 1952. Further, residents are shackled and handcuffed at all times when transported, despite the accompaniment of an armed guard. CP at 1952.
Residents undergoing "treatment" as well as those choosing not to participate in treatment are housed together, despite recommendations that segregation would further treatment goals. CP at 1951. SCC forensic therapists have conducted strip searches of Campbell and other residents, even though this practice is incompatible with the program treatment goals as it harms the therapeutic relationship. CP at 1952.
The only group therapy offered at SCC occurred for less than one year, met for a maximum of three hours each week, involved five residents at most, and was cancelled due to the inability of the leader to manage the group. CP at 1956. A resident is not permitted into group therapy until a comprehensive assessment has been completed and the resident has admitted the commission of crimes. CP at 1956.
There are no state certified sexual offender treatment providers on the SCC staff. CP at 1957. The staff members most directly involved in the treatment and management of residents are employees classified as forensic therapists. CP at 1957. Although the forensic therapists have primary responsibility for providing individual therapy to residents, none are psychologists, psychiatrists, psychiatric social workers, or nurses. CP at *785 1958. No treatment manual exists. CP at 1958.
The SCC has not established formal grievance procedures for the inmates. CP at 1953. No transition, work release, or aftercare program has been designed or implemented at the SCC. CP 1953-54. All treatment experts agree well-defined conditions of eligibility for release from detention and an aftercare program are a fundamental and necessary component to any treatment program for this population. CP at 1954.
The SCC staff have behaved inappropriately. For example, staff have verbally abused residents and made derisive comments about residents' status or race. CP at 1960. Staff have laughed during strip searches of residents. CP at 1960. And staff have requested residents to harm other staff members. CP at 1960. Pornography has been provided to residents by staff. CP at 1960.
Ample evidence supports the trial court's finding that the State has failed to provide Campbell with any meaningful treatment and the conditions of his confinement are nothing short of punitive.
Although the majority admits these and other conditions of confinement, and lack of treatment, are unconstitutional (Majority at 773), it fails to articulate the necessary conclusion that the confinement itself is thereby rendered unconstitutional. This is necessarily the proper legal conclusion because punitive conditions of confinement are inherently inconsistent with the civil nature of the statute. Indeed a previous majority of this court upheld the statute against claims of facial invalidity premised upon the ex post facto and double jeopardy clauses of the United States Constitution only because that majority held the statute was civil and nonpunitive on its face.
But if Campbell's incarceration is unconstitutional, he is entitled to an appropriate remedy, not judicial indifference. Although the majority reasons "the proper relief under the circumstances is to remedy any constitutional defects in the administration of the SCC," Majority at 776, the immediate task is to remove Campbell from the unconstitutional conditions, which means removing him from the SCC. Since this court previously held an individual confined under the "Sexually Violent Predator" statute may not challenge unconstitutional conditions of confinement prior to trial, In re Detention of McClatchey, 133 Wash.2d 1, 5, 940 P.2d 646 (1997), the practical effect of the majority's decision today is to subject individuals like Campbell to unconstitutional punishment without meaningful remedyeither prior to or even after unconstitutional confinement. Such jurisprudence is unrecognizable under traditional habeas practice.
It is clear ... that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody.
Preiser v. Rodriguez, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). The Supreme Court has traced the history of the writ:
[O]ver the years, the writ of habeas corpus evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law....
Id. at 485, 93 S.Ct. 1827, and has described the writ as "the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action," Harris v. Nelson, 394 U.S. 286, 290-91, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), emphasizing "there is no higher duty than to maintain [habeas corpus] unimpaired." Bowen v. Johnston, 306 U.S. 19, 26, 59 S.Ct. 442, 83 L.Ed. 455 (1939).
The instant proceeding, which attacks the very constitutionality of this confinement, must be distinguished from federal civil rights actions brought to challenge the conditions of confinement absent a claimed right to release. Cf. Crawford v. Bell, 599 F.2d 890 (9th Cir.1979) (petitioner did not challenge the legality of his imprisonment or allege he was entitled to release, but rather complained about the failure of prison authorities to provide a program of conjugal visits, a prison slaughterhouse that rendered tainted meat for prisoner consumption, and an inadequate law library).
But where a challenge to conditions of incarceration is derived from the entitlement *786 to incarceration, it is properly asserted as a habeas corpus proceeding, not one under the federal civil rights act, 42 U.S.C. § 1983. Martin A. Schwartz, The Preiser Puzzle: Continued Frustrating Conflict Between the Civil Rights and Habeas Corpus Remedies for State Prisoners, 37 DePaul L.Rev. 85, 148 (1988).
Although the United States Supreme Court has left open the question whether habeas corpus may be used to review the constitutionality of conditions of confinement, id. at 150 n. 393 (citing Bell v. Wolfish, 441 U.S. at 526 n. 6, 99 S.Ct. 1861), where the prisoner's incarceration is unconstitutional the remedy under habeas corpus is release or at least "release from the unconstitutional custody `subject to imposition of the potential lawful custody.'" Schwartz, supra, at 150 (quoting Note, Developments in the Law, Federal Habeas Corpus, 83 Harv. L.Rev. 1038, 1082 (1970)).
If there were a second special commitment center functioning in a constitutionally appropriate fashion to accomplish the civil goals of the statute, the state might have a strong argument that the court should transfer Campbell to that facility in lieu of release; however, in our state there is only one special commitment center and, as this record amply demonstrates and the majority admits, the conditions therein are unconstitutionally punitive.
Therefore the state has forced this court to choose between upholding the rights of this prisoner who is unconstitutionally confined, on the one hand, or continuing the unconstitutional confinement on the other. The majority's choice flies in the face of the United States Court of Appeals opinion in Young, 176 F.3d 1196, amended (Sept. 16, 1999), which pointedly states:
Nor did Young's factual challenge regarding the conditions of confinement receive a full and fair hearing by the Washington Supreme Court.
Id. at 1201. I would add, nor has Campbell's.

II.

Admissibility of Wolfe's Testimony.
Wolfe's expert testimony was not based on accepted scientific principles, was not helpful to the trier of fact, and therefore should not have been admitted into evidence.
Although I would order release independent of evidentiary rulings for the reasons stated above, the majority's treatment of the evidence issue deserves a dissent in its own right.
In the dark heart of the sex predator statute is the legislative denial of free will and individual responsibility. This is true because a "sexually violent predator" is legislatively defined as one "who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence...." RCW 71.09.020(1). Necessarily one who simply commits a violent sexual act through volitional choice is outside the statute. Such an individual is what the criminal law is made for. But in theory the person who does this because his "mental abnormality" or "personality disorder" "makes" him do it is not a person acting by his free will and, consequently, not one who can be held accountable for his choices.
Therefore evidence is necessary to distinguish between those who volitionally act of their free will and those who don't. On its face future acts of violence based on free choice are not only outside the statute but would seem unpredictable in principle. On the other hand one would expect those acting out their nonvolitional destiny by reason of a "mental abnormality" or "personality disorder" which causes violent sexual conduct would show themselves through the application of diagnostic criteria proved in the scientific arena to be reliable and accurate through repetition and replication. Reciprocally, when such predictions are not based on proven methodology they lack the competence justifying consideration by the trier of fact because they provide no factual assistance, only prejudice, speculation, and/or what some may call "junk science."
The necessity for testimony based upon good science is only heightened by the statistical *787 observation that 88 percent of sex offenders will not reoffend if released,[2] although even if the ratio were reversed we would still require proof beyond a reasonable doubt that the specific individual at bar met the criteria. If expert testimony does not reliably and validly distinguish the individual within the statutory class subject to commitment from he who is not, a grave injustice has occurred because we have deprived an individual his liberty without sufficient factual basis.
Thus a probing inquiry into the scientific basis of such testimony as a threshold to its admission into evidence is not only entirely appropriate but absolutely necessary.
According to the majority, Campbell challenges the admissibility of Mr. Wolfe's testimony because "he generally questions the ability for anyone to `predict dangerousness.'" Majority at 779. To this, the majority counters, "[b]oth this court in Young, 122 Wash.2d at 56-58, 857 P.2d 989, and the United States Supreme Court in Barefoot v. Estelle, 463 U.S. 880, 896-903, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), have specifically rejected this kind of argument." Majority at 779 (footnote omitted). But the majority misconstrues Campbell's argument and fails to acknowledge ample authority supporting his position.
Campbell challenges the admissibility of Wolfe's testimony on the basis of Frye v. United States, 54 App. D.C. 46, 293 F. 1013, 34 A.L.R. 145 (1923) and ER 702. Campbell does not "generally" question the ability to predict dangerousness but specifically challenges the unscientific method employed by Wolfe to make his prediction in this case.[3] Campbell argues "[w]hile Wolfe continued to claim an actuarial basis for his conclusion, the evidence he presented was purely clinical and therefore inherently unreliable." Reply Br. of Appellant at 24. Notwithstanding overwhelming expert testimony that questioned the validity of predicting dangerousness using either method, the trial court admitted Wolfe's opinion testimony absent a generally accepted scientific basis.
"The rationale of the Frye standard, which requires general acceptance in the relevant scientific community, is that expert testimony should be presented to the trier of fact only when the scientific community has accepted the reliability of the underlying principles." State v. Copeland, 130 Wash.2d 244, 255, 922 P.2d 1304 (1996) (citation omitted). While it is not the function of the court itself to assess the reliability of the evidence, "`[i]f there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted.'" Id. at 255, 922 P.2d 1304 (quoting Cauthron, 120 Wash.2d at 887, 846 P.2d 502).
Thus, the question is whether the psychiatric community has accepted the reliability of either the clinical or actuarial method to predict dangerousness. To answer, we must "undertake a searching review which may extend beyond the record and involve consideration *788 of scientific literature as well as secondary legal authority." Copeland, 130 Wash.2d at 255-56, 922 P.2d 1304 (citations omitted).
When conducting risk assessments, mental health professionals employ two distinct methods. With the clinical approach, "expert evaluators consider a wide range of empirically validated risk factors and then form an overall opinion concerning the offender's recidivism risk." R. Karl Hanson, What Do We Know About Sex Offender Risk Assessment?, 4 Psychol., Pub. Pol'y, & L. 50, 52 (1998). In contrast, "the actuarial approach considers a small number of variables but applies explicit rules for translating the rankings on the individual variables into an overall risk rating." Id. at 62.
There is, however, widespread agreement among mental health experts that clinical predictions of dangerousness are highly unreliable.
In literally hundreds of comparisons over many domains including the prediction of recidivism, clinical judgment has essentially never been found to be superior to actuarial methods, whereas the converse has most often been demonstrated (Grove & Meehl, 1996; Mossman, 1994). Some studies have shown better-than-chance (i.e., they outperformed blind guesswork) performance by clinicians, but many have not. No studies have demonstrated that clinicians' judgments are more accurate than those of laypersons, and there is at least one study showing that they are not (Quinsey & Ambtman, 1979).
Grant T. Harris et al., Appraisal and Management of Risk in Sexual Aggressors: Implications for Criminal Justice Policy, 4 Psychol., Pub. Pol'y, & L. 73, 88 (1998). Nor, for that matter, has the reliability and validity of the actuarial method been established either:
Although significant advances have been made in the ability to predict sex offender recidivism, the application of these schemes to individuals convicted under sexual predator laws is still problematic. Even though the actuarial prediction scheme significantly improved prediction over chance, there are still a number of false positives and negatives.
Judith V. Becker & William D. Murphy, What We Know and Do Not Know About Assessing and Treating Sex Offenders, 4 Psychol., Pub. Pol'y, & L. 116, 126 (1998); see also Eric S. Janus & Paul E. Meehl, Assessing the Legal Standard for Predictions of Dangerousness in Sex Offender Commitment Proceedings, 3 Psychol., Pub. Pol'y, & L. 33 (1997); Gary Gleb, Washington's Sexually Violent Predator Law: The Need to Bar Unreliable Psychiatric Predictions of Dangerousness from Civil Commitment Proceedings, 39 UCLA L.Rev. 213, 227 (1991). Even those who cautiously endorse the actuarial method acknowledge the theory has not gained general acceptance. See R. Karl Hanson, supra, 4 Psychol., Pub. Pol'y, & L. at 52; Grant T. Harris et al., supra, 4 Psychol., Pub. Pol'y, & L. at 90-91; Eric S. Janus & Paul E. Meehl, supra, 3 Psychol., Pub. Pol'y, & L. at 60-61; Gleb, supra, 39 UCLA L.Rev. at 246-47. Since neither the clinical nor the actuarial method to predict the likelihood of reoffense has gained general acceptance in the psychiatric community, the Frye standard has not been met. To hold otherwise would be to allow preference for result to dictate the boundaries of science.
The majority erroneously contends Young and Barefoot v. Estelle have conclusively decided this issue adverse to the prisoner. Not so. In Young this court cited one study in support of the proposition that sexual recidivism may be accurately predicted; however, it did not endorse the quite different proposition that such predictions are generally accepted as reliable and valid. As Frye requires "general acceptance" before a scientific theory may be presented to the jury, Young's analysis does not establish the requisite general acceptance. Barefoot is equally inapplicable. There the appellant argued his Eighth and Fourteenth Amendment rights were violated by the State's use of psychiatric testimony at the sentencing phase of his capital case. When Justice Blackmun argued in his dissent "scientific proof" was lacking to establish future dangerousness, the Court responded "[t]he federal cases cited [by the] dissent as rejecting `scientific proof' ... are not constitutional *789 decisions, but decisions of federal evidence law." Barefoot v. Estelle, 463 U.S. 880, at 899 n. 6, 103 S.Ct. 3383, 77 L.Ed.2d 1090. But the issue here is evidentiary. Neither Young nor Barefoot addressed the evidence issue raised by Campbell, nor has the majority.
Wolfe's testimony was equally inadmissible under ER 702 because it was not helpful to the trier of fact. ER 702 allows testimony by an expert only if it "will assist the trier of fact to understand the evidence." This includes an evaluation of the admissibility of a particular expert's opinion based upon general acceptance, if any, of the principles from which he reasons.
If there is a precise problem identified by the defense which would render the test unreliable, then the testimony might not meet the requirements of ER 702 because it would not be helpful to the trier of fact.
State v. Cauthron, 120 Wash.2d 879, 890, 846 P.2d 502 (1993).
State v. Greene, 139 Wash.2d 64, 984 P.2d 1024 (Wash.1999) is also helpful. There we held expert testimony the defendant suffered from disassociative identity disorder (DID) would not be helpful to the trier of fact and refused to admit it notwithstanding the admitted expertise of the witness. Although we found DID is generally accepted within the scientific community as a diagnosable condition, this "does not necessarily mean, however, that such evidence is admissible in any particular case." Greene, at 73, 984 P.2d at 1028. Rather, scientific evidence is inadmissible under ER 702 "unless it is helpful to the trier of fact under the particular facts of the specific case in which the evidence is sought to be admitted." Greene, at 73, 984 P.2d at 1028 (citation omitted) (emphasis added). An examination of the particular facts in Greene revealed the experts were unableusing any methodto reliably evaluate the sanity of a defendant suffering from DID.
According to the testimony and argument in this case, however, none of the various approaches have been accepted as producing results capable of reliably helping to resolve questions regarding sanity and/or mental capacity in a legal sense.
Id. at 77, 984 P.2d at 1031.
Here the psychiatric community has not generally accepted either the clinical or actuarial method to identify past sexual offenders who will reoffend in the future. As Wolfe claimed an actuarial basis for conclusions actually derived from a clinical approach, the trial court erred in admitting his testimony as neither method has been generally accepted by the psychiatric community to produce reliable results. This testimony was not helpful to the trier of fact and was therefore inadmissible under ER 702 and incompetent under Frye.

III.

Conclusion
It was clear to the United States Court of Appeals for the Ninth Circuit "that the Washington state courts did not afford Young a full and fair hearing concerning the conditions of confinement in the Special Commitment Center." Young, 176 F.3d at 1201, amended (Sept. 16, 1999). So too it must be equally clear that the majority in this proceeding continues that unfortunate result-oriented trend. The Great Writ of antiquity[4] mandates the burden of unlawful restraint be lifted from this man's shoulders. I dissent.
MADSEN, J. (concurring in the dissent).
I concur in the result urged by the dissent because the care and treatment provided for sex predators at the Special Commitment Center (SCC) violates state law.
As a part of the sexually violent predator act, chapter 71.09 RCW, the Legislature expressly guaranteed persons committed under the chapter the right to adequate care and treatment and expressly preserved all legal and constitutional rights not lost by the fact of commitment itself.

*790 (1) Any person subjected to restricted liberty as a sexually violent predator pursuant to this chapter shall not forfeit any legal right or suffer any legal disability as a consequence of any actions taken or orders made, other than as specifically provided in this chapter.
(2) Any person committed pursuant to this chapter has the right to adequate care and individualized treatment.
RCW 71.09.080. Thus, Mr. Campbell has a statutory right to care which meets constitutional requirements while he is detained as a sexually violent predator.
It is this court's duty to follow the law. The majority does not disagree with the trial court's findings that many of the conditions at the SCC are unconstitutional.[1] These conditions are fully catalogued by the dissent. Dissent at 784-785. Such conditions cannot be the "adequate care" to which he is statutorily entitled. Yet the majority provides no remedy for Mr. Campbell despite the six years in which he has been detained under unconstitutional conditions in contravention of state law. The Department of Corrections cannot legally detain Mr. Campbell indefinitely while it attempts to correct the deficiencies. It is time to release him on the same conditions that are imposed on other sex offenders who have served out the punishments imposed by our criminal laws.
NOTES
[1] We note the issuance of the 15th report of the special master and the May 27, 1999 order issued by Judge Dwyer in Turay v. Weston. The federal injunction against the SCC has not been lifted although, in its order, the federal court acknowledged the state Department of Corrections' continuing progress toward full compliance.
[2] Although the dissent believes Young v. Weston is "dispositive" of its position that release is the remedy here, dissent at 1, the case actually decides nothing other than petitioner there is entitled to an evidentiary hearing on his claims. In order to prevail, Young must still prove his conditions of confinement are so punitive as to constitute punishment. Weston, 176 F.3d at 1199. To date, not a single court has found that the conditions of confinement at the SCC are so punitive in nature as to constitute punishment. Nor has Campbell so proven here.
[3] In Young, we not only reaffirmed our prior holding in In re Harris, 98 Wash.2d 276, 280, 654 P.2d 109 (1982), that predictions of future dangerousness do not violate due process, but we also concluded such predictions satisfied the standard for general acceptance in the scientific community set forth in Frye v. United States, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C.Cir.1923), and the predictions at issue in that case met the requirements of ER 702. Young, 122 Wash.2d at 56-58, 857 P.2d 989.

In determining that predictions of future dangerousness do not offend the United States Constitution, the United States Supreme Court noted "the rules of evidence generally extant at the federal and state levels anticipate that relevent, unprivileged evidence should be admitted and its weight left to the fact finder, who would have the benefit of cross-examination and contrary evidence by the opposing party." Barefoot, 463 U.S. at 898, 103 S.Ct. 3383.
[1] Since one can be "sentenced" only under a criminal statute, and this court upheld the statute against facial challenge in In re Personal Restraint of Young, 122 Wash.2d 1, 857 P.2d 989 (1993) only by concluding it is civil, not criminal, id. at 23, 857 P.2d 989, use of the term "sentence" by the majority may be the judicial equivalent of a "Freudian slip" acknowledging the true nature of the proceedings.
[2] Eric S. Janus & Paul E. Meehl, Assessing the Legal Standard for Predictions of Dangerousness in Sex Offender Commitment Proceedings, 3 Psychol., Pub. Pol'y, & L. 33, 53 (1997) ("In Washington State, the measured sex-offense re-arrest rate for the same group was 12%, with a follow-up period of 7 years." (citing Washington State Institute for Public Policy, Findings from the Community Protection Research Project: A Chartbook 25 (5th ed.1996))).
[3] Dicta in In re Harris, 98 Wash.2d 276, 280, 654 P.2d 109 (1982), suggests that predictions of future dangerousness do not necessarily violate constitutional due process although "[t]here is no question the prediction of dangerousness has its attendant problems." Id. at 281, 654 P.2d 109, In re Young, 122 Wash.2d at 56, 857 P.2d 989. Although in Harris we stated, "[W]e are not prepared to abandon the possibility of conforming the law of involuntary civil commitment to the requirements of the constitution," Harris, 98 Wash.2d at 281, 654 P.2d 109 (emphasis added), that is a far cry from stating such evidence, particularly when based upon methodology not generally accepted, is admissible under ER 702.

In In re Young, 122 Wash.2d at 55, 857 P.2d 989, a majority of the court, citing Harris, rejected the claim "that the experts had no basis for their testimony that any particular mental abnormality or personality disorder exists which makes a person likely to rape, or ... reoffend" notwithstanding the considered contrary opinion of the Washington State Psychiatric Association. Hopefully this statement is not a blanket invitation to admit all such testimony no matter how incompetent, but only a sentiment that in the context of a facial challenge we cannot presume all such testimony would necessarily be inadmissible no matter what its basis.
[4] For general discussion see In re Personal Restraint of Well, 133 Wash.2d 433, 451-52, 946 P.2d 750 (1997) (Sanders, J., dissenting).
[1] As noted by the majority, the federal court likewise found conditions at SCC unconstitutional in Turay v. Weston, No. C91-664WD (W.D.Wash.1994).