# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 50008-6-II |
| B.R., | UNPUBLISHED OPINION |
| Respondent. | |

BJORGEN, C.J. — B.R. appeals from an order involuntarily committing him for up to 180 days of mental health treatment, asserting that the State failed to present sufficient evidence that he is "gravely disabled" as defined in RCW 71.05.020(17). B.R. also asserts that, absent sufficient evidence supporting the conclusion that he is gravely disabled under the statute, the involuntary commitment order violated his due process rights. We affirm.

## FACTS

B.R. has been diagnosed with schizophrenia, disorganized type, and marijuana use disorder. On April 15, 2016, the King County Superior Court entered an order involuntarily committing B.R. to Western State Hospital (WSH) for up to 180 days of mental health treatment on the basis of grave disability. On September 26, Afzaal Jafri, M.D., and Jeff Crinean, Ph.D., petitioned the Pierce County Superior Court for an order continuing B.R.'s involuntary mental health treatment at WSH for up to an additional 180 days.

Dr. Jafri and Dr. Crinean's declaration[1] in support of the re-commitment petition detailed B.R.'s past psychiatric history. The declaration stated that B.R. "first began to evidence problems as a young teen, having repeated altercations with peers." Clerk's Papers (CP) at 13. B.R. was first hospitalized in 2009 and again in 2010. B.R. benefited from medications prescribed at that time but "has a consistent history of noncompliance with treatment in the community." CP at 13. B.R. was first admitted to WSH on August 15, 2011, for 15 days of competency evaluation related to motor vehicle theft charges, for which he was eventually convicted. B.R. was again admitted to WSH on February 19, 2013 until his discharge on October 26, 2013. After his discharge to a shelter, B.R. refused "all recommended mental health outpatient follow-up." CP at 13.

Dr. Jafri and Dr. Crinean's declaration further detailed B.R.'s history in relation to his present illness. The declaration stated that B.R. was admitted to WSH on February 18, 2014, for competency restoration related to third degree assault charges. B.R.'s competency was not restored, his charges were dismissed, and he was converted to civil commitment status. In September 2014, B.R. went on unauthorized leave and was discharged from WSH. Since that discharge, B.R. "has been essentially homeless in King County, at times using shelters, while not accepting any mental health services." CP at 12.

Between September 2014 and October 2015, B.R. was arrested for various misdemeanor offenses and was evaluated eight times for competency to stand trial. Every competency evaluator found B.R. incompetent to stand trial due to "continuous schizophrenia versus

---

[1] The first page of the declaration, Clerk's Papers at 11, shows the petitioners as Kamran Naficy, M.D. and Jeff Crinean, Ph.D. The signature page is signed and attested to by Dr. Crinean and Dr. Jafri.

schizoaffective disorder." CP at 12. Every evaluator also recommended against competency

restoration treatment due to its ineffectiveness. As related to his most recent commitment at

WSH, Dr. Jafri's and Dr. Crinean's declaration stated:

> On 11/23/15, [B.R.] was arrested for *theft* (allegedly having his hand in the till at a store) and *assault* (two counts for spitting) and was again jailed. In jail he was noted to have poor ADLs [activities of daily living] and was responding to internal stimuli, with impaired communication. This led to a CFES [Community Forensic Evaluation Services] evaluation by Dr. Johnson 12/9/15, with the same recommendations being made to the court as in his previous CFES reports. His charges were dismissed and the patient was detained to Navos [until the prosecutor withdrew a civil commitment petition]. . . . The patient's father then took him home, but the patient's sleeplessness, continued RTIS,[2] disorganization, and hostile behavior led to the patient again being detained to Navos on the basis of grave disability. . . .
>
> He has remained at Navos since then, being treated with [certain psychiatric medications]. . . . At Navos the patient showed little response to treatment, with continued poor ADLs, RTIS, disorganized thinking, and poor communication. He was isolative and opposed to treatment (including medications, at times requiring an IM backup order). He was transferred to WSH when a bed became available, under a new 180-day civil commitment order.

CP at 12.

On October 3, 2016, the superior court held a hearing to address the petition for B.R.'s

continued involuntary commitment, at which Dr. Crinean and B.R. testified. Dr. Crinean

testified that he was B.R.'s treating psychologist and had diagnosed B.R. with "schizophrenia,

undifferentiated type, . . . [and] marijuana use disorder." Report of Proceedings (RP) at 3-4. Dr.

Crinean stated that B.R. exhibited behaviors indicative of schizophrenia symptoms that included

responding to internal stimuli, expressing paranoid beliefs, social isolation, and cognitive

disorganization.

---

[2] Based on context, we take this abbreviation to stand for "response to internal stimuli."

As an example of B.R.'s response to internal stimuli, Dr. Crinean stated that staff have observed B.R. holding conversations with himself as if someone else was present. Dr. Crinean also stated that B.R. believed he was being detained at WSH illegally because his "servmant" had expired. RP at 6. Dr. Crinean explained that B.R.'s use of the term "servmant" was an example of a neologism, or a "merging of words that make sense to the person but are not standard language." RP at 7. Dr. Crinean stated that B.R.'s use of a neologism was an example of his cognitive disorganization. As another example of cognitive disorganization, Dr. Crinean stated:

> Also, in his case, he was trying to explain his position but he would get off track in his conversation. He'd sort of wander down a pathway that was tangentially related to what he was trying to say and then I'd have to bring him back to try and understand what he was trying to communicate with me.

RP at 7.

Dr. Crinean testified that B.R. lacks insight about whether he suffers from a mental illness. When asked whether B.R.'s mental illness affects his judgment, Dr. Crinean responded:

> Based upon observation and the psychiatrist's opinion, it severely impairs his judgment. He is so disorganized at this point the staffs' opinion is that he would be unable to meet his needs in the community. He simply can't formulate the decision-making necessary to get housing, to get his meds, to get food, to get his benefits restarted.

4

RP at 7-8. When asked whether B.R.'s routine functioning would deteriorate if he left WSH at that time, Dr. Crinean responded in the affirmative, stating his belief that B.R. would immediately stop taking his medications and "would rapidly be re-detained and recirculated through the mental health system." RP at 8. Dr. Crinean concluded that B.R. is gravely disabled as a result of his mental illness and that no less restrictive alternative to hospitalization was in B.R.'s best interest.

B.R. testified that he felt ready to leave WSH and would go live at his father's home if released. He later testified, however, that "my dad doesn't really want me at the house and he doesn't want me on the street." RP at 19. When asked whether he was taking his medications at WSH, B.R. responded, "Yeah. I chose not to and hopefully to get the same status as I had, non-grave disabled with no medication discharge from Navos, December 27th." RP at 12. When asked whether he would be willing to continue taking medication in the community, B.R. stated:

> I'd look into taking medication. It did keep the cops away. But I was seen [sic] non-grave disabled with no medication December 27th and returned to the hospital December 28th to check my medication when I was—I was free and cleared to go.

RP at 13. B.R. stated that after his most recent discharge from Navos, he was in the community for one day before being re-committed.

The trial court found, in relevant part, that the following fact was proven by clear, cogent, and convincing evidence:

> As a result of a mental disorder, Respondent:
> . . . .
> manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

No. 50008-6-II

CP at 19-20. The trial court entered an order involuntarily committing B.R. for up to an additional 180 days, concluding that B.R. continued to be gravely disabled and that less restrictive alternatives to involuntary detention were not in his best interests. B.R. appeals from the involuntary commitment order.

ANALYSIS

I. MOOTNESS

As an initial matter, B.R. asserts that we should address the merits of his appeal regardless of whether it has been rendered moot due to the expiration of his 180-day involuntary commitment order. In response, the State correctly notes our opinion in *In re Detention of M.K.*, 168 Wn. App. 621, 625, 279 P.3d 897 (2012), which held that appeals from involuntary commitment orders are not moot despite their expiration because of the adverse consequences that may flow from such orders in future involuntary commitment determinations. Accordingly, this appeal is not moot, and we address it on the merits.

II. SUFFICIENCY OF THE EVIDENCE

B.R. contends that the State failed to present sufficient evidence to support the trial court's conclusion that he continues to be gravely disabled under RCW 71.05.020(17). We disagree.

A.     <u>Legal Principles</u>

Where, as here, a trial court weighs evidence in reaching its involuntary commitment decision, our review is limited to determining whether substantial evidence in the record supports

6

its findings of fact and, if so, whether the findings in turn support the trial court's conclusions of law. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). The State is required to prove the requirements for involuntary commitment by clear, cogent, and convincing evidence. *In re LaBelle*, 107 Wn.2d at 209. "Accordingly, we will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *In re LaBelle*, 107 Wn.2d at 209.

B.R. does not assign error to any of the trial court's factual findings, which would generally render the findings verities on appeal. *In re Det. of Campbell*, 139 Wn.2d 341, 364, 986 P.2d 771 (1999). However, we may review findings of fact despite a failure to assign error where it is clear from the opening brief that the party is challenging the finding. *Harris v. Urell*, 133 Wn. App. 130, 137, 135 P.3d 530 (2006). It is clear from B.R.'s opening brief that he is challenging the sufficiency of evidence in support of the trial court's finding that he "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." Br. of Appellant at 1. Accordingly, we review whether the State presented substantial evidence in support of that finding, which the trial court could reasonably have found to be clear, cogent, and convincing.

An individual who is involuntarily committed to 90 or 180 days of mental health treatment may be recommitted if the court or jury finds that the individual "[c]ontinues to be gravely disabled." RCW 71.05.320(4)(d). RCW 71.05.020(17) defines

7

"gravely disabled" as:

> a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health and safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

Here, the trial court determined that B.R. continued to be gravely disabled under the second definition, RCW 71.05.020(17)(b).

RCW 71.05.020(17)(b) "permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.'" *In re LaBelle*, 107 Wn.2d at 206 (quoting Mary L. Durham & John Q. LaFond, THE EMPIRICAL CONSEQUENCES AND POLICY IMPLICATIONS OF BROADENING THE STATUTORY CRITERIA FOR CIVIL COMMITMENT, 3 Yale L. & Pol'y Rev. 395, 410 (1985)). When proceeding under RCW 71.05.020(17)(b)'s definition of "gravely disabled":

> the evidence [must] provide a factual basis for concluding that an individual "manifests severe [mental] deterioration in routine functioning." Such evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

> Furthermore, the mere fact that an individual is mentally ill does not also mean that the person so affected is incapable of making a rational choice with respect to his or her need for treatment. Implicit in the definition of gravely disabled under RCW 71.05.020(1)(b) is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment. This requirement is necessary to ensure that a causal nexus

exists between proof of "severe deterioration in routine functioning" and proof that the person so affected "is not receiving such care as is essential for his or her health or safety."

*In re LaBelle*, 107 Wn.2d at 208 (second alteration in original).

B.      Substantial Evidence Supports the Challenged Finding

Here, the State presented sufficient evidence to support the trial court's finding that B.R. "[1] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and [2] is not receiving such care as is essential for his or her health or safety."  CP at 20.

    1.  Severe Deterioration in Routine Functioning

To satisfy the first prong of RCW 71.05.020(1)(b)'s definition of "gravely disabled," the State must present clear, cogent, and convincing evidence showing a factual basis for concluding that the respondent "'manifests severe [mental] deterioration in routine functioning,'" which evidence must include "recent proof of significant loss of cognitive or volitional control." *In re LaBelle*, 107 Wn.2d at 208 (alteration in original) (quoting former RCW 71.05.020(1)(b)).  Here, the State's evidence showed that B.R. was involuntarily committed following his arrest and charges in 2015 for theft and two counts of assault.  While jailed on those charges, B.R. was noted to have poor activities of daily living and was responding to internal stimuli.

Dr. Crinean testified that, during B.R.'s initial 180-day involuntary commitment at WSH, B.R. responded to internal stimuli, expressed paranoid beliefs, and exhibited cognitive disorganization.  Further, Dr. Crinean provided examples of B.R. exhibiting these behaviors while at WSH.  The State's evidence also included a recitation of B.R.'s psychiatric history, which history showed B.R.'s repeated arrests in the community, unsuccessful competency

9

restorations, and involuntary commitments. We hold that this evidence was sufficient for the trial court to find, under the clear, cogent, and convincing standard, that B.R. "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions." CP at 19-20.

2. Care Essential for Health and Safety

To satisfy the second prong of RCW 71.05.020(1)(b)'s definition of "gravely disabled," the State must present clear, cogent, and convincing evidence showing a factual basis for concluding that the respondent would not receive in the community "such care as is essential for his or her health or safety." *In re LaBelle*, 107 Wn.2d at 208. "To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." *In re LaBelle*, 107 Wn.2d at 208.

Here, the State presented evidence that B.R. had little insight about his mental illnesses and had been resistant to taking his prescribed psychiatric medications. B.R.'s own testimony was, at best, equivocal about whether he would continue mental health treatment and taking prescribed medications if released to the community or a less restrictive alternative to involuntary commitment. Dr. Crinean testified that, in his and WSH staff's opinion, B.R.'s current mental health condition prevented him from meeting his basic needs in the community. In this respect, Dr. Crinean stated that B.R. "simply can't formulate the decision-making necessary to get housing, to get his meds, to get food, to get his benefits restarted." RP at 8.

In addition, the State presented evidence that B.R.'s history of discontinuing mental health treatment has led to repeated hospitalizations, arrests, criminal charges, and jail

10

admissions. Under RCW 71.05.285, the trial court was required to give "great weight" to this evidence when determining whether inpatient or less restrictive alternative commitment was appropriate, and "[s]uch evidence may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety."

We hold that the above evidence was sufficient for the trial court to find, under the clear, cogent, and convincing standard, that B.R. "is not receiving such care as is essential for his or her health or safety." CP at 20. Because sufficient evidence supports the trial court's finding that B.R. "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety," it properly concluded that B.R. is gravely disabled as defined under RCW 71.05.020(1)(b). CP at 19-20.

### III. DUE PROCESS

Finally, B.R. contends that the trial court's involuntary recommitment order violated his due process rights. However, B.R.'s due process argument relies entirely on his contention that the State failed to present evidence sufficient to show he was gravely disabled under RCW 71.05.020(1)(b). Having rejected that contention, we need not further address his due process argument.

Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the

11

No. 50008-6-II

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

BJORGEN, C.J.

We concur:

WORSWICK, J.

MELNICK, J.